## MATHEWS *v.* GILLISS.

Where a principal executed and gave to his agent, a power to sell, which read as follows: "Price of land drawn by W. Gilliss. Share No. 20 in the half-breed tract in Lee county, Iowa.

| | |
|---|---:|
| For all my land 880 acres, at $10 per acre, | $8,800 |
| Lots in Keokuk, 1, 2, and 3, in block 46, | 600 |
| Lots " " 1, 2, 3, 4, 5, and 6, in block 120, | 500 |
| Lots " " 7, 8, 9, 10, 11, and 12, " 121, | 500 |
| | $10,400 |

The above lands, I will sell all together at the above prices, to any person or persons, on the following terms: One half cash in hand; the balance, one and two years' credit.

Kansas, Mo., March 29th, 1851.    WM. GILLISS.

Mr. L. E. Johnson is authorized to control and sell the above lands and lots, at the above prices, and deeds to be made by W. Gilliss, whenever the purchase money is paid. W. Gilliss;" and where the agent made a contract for the sale of eighty acres of the land, and for lots one, two and three, in block 46, which contract did not require any payment down, in an action to enforce the contract; *Held,* That the paper constituted but one instrument; that the eight hundred and eighty acres were to be sold in one entire body, and not

· in separate parcels; and that the agent possessed no authority, under the power, to make the sale of the eighty acres of land.

Where the purchaser from the agent, subsequently wrote a release of all the town lots, and all the eighty acres, except ten acres, upon the back of the bond for a deed he received from the agent; and where it appeared that a subsequent agent of the same principal, sold the town lots and all of the eighty acres, except the ten acres not released by the purchaser; that said subsequent agent refused to sell the said ten acres, although offered an enhanced price; and that he demanded of the purchaser, one-half of the purchase money, under the contract made with the first agent; and where the complainant, in his petition, alleged a ratification of the contract by the principal, and the answer of the defendant, although specific in its denial of all the other material allegations of the petition, did not deny the allegation of ratification; *Held,* That the contract, made by the agent, although unauthorized by the power under which he acted, was subsequently ratified by the principal.

Unless the parties have expressly treated time as of the essence of the contract, or unless it necessarily follows from the nature and circumstances of the contract, in equity, time is not deemed of the essence of the contract.

Compensation, and not forfeiture, is the doctrine of equity.

Where a contract for the sale of real estate, provides that the purchaser is to pay one-half of the purchase money on a given day—one-fourth in one year, and the balance in two years from said given day—and that upon the fulfillment of said contract upon the part of the vendee, at the time, and in the manner specified, the vendor is to convey the premises, time is not of the essence of the contract.

In equity, it is not necessary that a party should show a strict legal compliance with the terms of his contract, unless the non-compliance goes to the essence of the contract.

Where a contract for the sale of real estate was made on the first day of May, 1851, and by the terms of the contract, one-half of the purchase money was to be paid on or before the first of July following; one-fourth in one year, and the balance in two years from the said first of July; and where the purchaser failed to make the payments as they matured, but on the day after the last payment became due, offered to pay the amount due on the contract, which was refused, and on the same day, commenced suit to enforce the contract; *Held,* That the plaintiff had not been guilty of such negligence in asserting his claim, or so delayed the performance of, or offer to perform, his contract, as not to be entitled to relief in equity.

## *Appeal from the Lee District Court.*

On the 29th of March, 1851, Gilliss was the owner of share No. 20, in the half-breed tract in Lee county. He resided in Kansas, Mo. One Lyman E. Johnson, at that time visited defendant for the purpose of purchasing that

share.  Being unable to contract, defendant made Johnson his agent to dispose of the same, and executed the following instrument or instruments:

"Price of land drawn by Wm. Gilliss, share No. 20, in the half-breed tract in Lee county, Iowa :—

| | | | |
|---|---|---|---:|
| For all my land, 880 acres, at $10 per acre, . . . | | | $8,800 |
| Lots in Keokuk, 1, 2, and 3, in block 46, . . . . | | | 600 |
| " | " | 1, 2, 3, 4, 5, and 6, in block 120, | 500 |
| " | " | 7, 8, 9, 10, 11, and 12, " 121, | 500 |

$10,400

"The above lands I will sell all together, at the above prices, to any person or persons, on the following terms : One-half cash in hand; the balance, one and two years' credit.

Kansas, Mo., March 29th, 1851.          WM. GILLISS.

"Mr. L. E. Johnson is authorized to contract and sell the above lands and lots at the above prices, and deeds to be made by Wm. Gilliss, whenever the purchase money is paid.

"WM. GILLISS."

Johnson and Joel Mathews (the decedent), were at that time law partners, and Gilliss gave Johnson fifty dollars with which to pay taxes on this property, for which Johnson gave a receipt in the name of the firm.

On the 1st day of May, 1851, Johnson, as attorney in fact of Gilliss, sold a portion of said share, to wit: the west half of the northeast quarter of section 26, township 65, range 5, and lots 1, 2, and 3, in block 46, in Keokuk, to Mathews, for $1,800.  A bond for a deed was executed, signed by Johnson, as attorney in fact of Gilliss.  By the terms thereof, Mathews was to pay one-half of the purchase money, on or before the 1st of July then next; one-fourth in one year ; and the balance in two years from said 1st of July.  Upon the fulfillment of said contract on the part of Mathews, "in the manner and at the time specified, the said

Gilliss doth hereby sell and agree to convey by warranty deed" to said Mathews, the said real estate. The deed was to be executed on the 1st of July, 1851, upon the payment of the first sum. At that time, Mathews was to mortgage the premises, to secure the remaining payment. No deed or payment was made at the time specified. On the 16th of October, 1851, Mathews paid Johnson seventy-five dollars, which is receipted in the name of Johnson, as the attorney of Gilliss, on said contract. On the first day of October of the same year, Gilliss gave to one Barkley a power of attorney, authorizing and empowering him to sell and convey all his lands and lots in Iowa; and to collect all moneys due him, giving him full power in relation to suits, arbitrations, compromises, receipts, sales, deeds, and conveyances, and all matters connected with said lands. On or about the 12th of October, 1851, Barkley arrived in Keokuk. On the 20th of the same month, Mathews, on the bond which he had received, wrote a release of the lots, and all of the eighty acres, except the ten acres now claimed in this suit. What was the inducement or the contract leading to this release, is not positively shown. The release, however, recites that the lots and the other portion of land had been sold to Claggett, the city of Keokuk, Miller, and Hine. From the exhibits filed, it appears that on the 16th, 18th, and 20th of October, Barkley sold forty acres of the land to the city of Keokuk; ten acres to Miller; twenty acres to Hine; and the lots to Claggett; and on those days, gave them either deeds, or bonds for deeds, as the attorney for Gilliss. Barkley sold the land and lots at the same price for which Johnson had sold, except that purchased by Hine, which was sold at five dollars more per acre. The instrument executed to Miller for the ten acres purchased by him, was acknowledged before Johnson, as notary public.

Barkley in his deposition, taken on the part of defendant, states, that while in Keokuk as aforesaid, he had conversations with Mathews; that he demanded of Mathews seventy-five dollars, the one-half of the sale money for ten acres of the aforesaid eighty acres, which Johnson had promised to

Mathews; that Mathews failed to raise the money, and told him that he (Mathews) was going to St. Louis at the same time witness did, and would there arrange it; that Mathews did not pay or tender the money to witness, either in Keokuk or St. Louis; that Johnson, before that, had sent to Gilliss a deed to execute for the eighty acres to Mathews, but that Gilliss refused to make the same, for the reason that the payments had not been made according to contract; that on the 19th or 20th of October, 1851, he did offer to let Mathews have ten acres, by Mathews complying with the payments. What the payments were he does not state, except one-half to be paid at the time; that two other persons had proposed to purchase the same ten acres, at that time, offering an advance of five dollars per acre, but that witness, feeling under obligations to let Mathews have it, if he made the payment, refused to sell the same; that he was at the office of Mathews frequently, and had frequent conversations with him with regard to this land, while in Keokuk, in the presence of Johnson and others; and that he did demand the sum of seventy-five dollars, it being the one-half of the purchase money for the lands described in plaintiff's third interrogatory (being the land in controversy), from said Mathews, about the 19th or 20th of October, 1851, the said amount being then due on said land, upon the sale of the said ten acres from the said Gilliss to the said Matthews. He also says that he was present and wrote the instrument given by Gilliss to Johnson; that Johnson was not to receive any money on any sale made, but if he found any person wishing to purchase, he was to inform Gilliss, and if Gilliss was willing to sell at the price or prices reported, then he was to go to Keokuk, receive the money, and make the conveyance of said lands; that Johnson had before that time acted as agent for Gilliss, in relation to said lands, and before his partnership with Mathews.

Thomas W. Claggett states, that on or about the 18th of October, 1851, Barkley offered to sell him this eighty acres of land and the town lots; that wishing to purchase a portion of the town lots, and having notice of the Mathews

contract, he called on him before purchasing; told him of Mr. Barkley's offer, and that he (witness) wished to purchase some of the lots; and asked him if he had any claim on the property; that Mathews told him that he could not comply with the purchase which he had made of Johnson, and that he had given up the same, and witness might do as he pleased. Witness purchased the lots, and at the same time, Mathews stated it was a good bargain; that he could not comply with the terms of the purchase, as he had not the means, and advised the witness to buy the whole eighty acres. Witness also states, that the ten acres in controversy, was worth from $100 to $125 per acre at the time of the commencement of this suit. Another witness speaks of the value of the ten acres in the fall of 1854, and in February, 1855, and fixes it, at from $160 to $200 per acre.

On the 2d of July, 1853, Mathews offered in writing to pay the said Gilliss ninety dollars, being the amount which he claimed was due Gilliss on said contract. The evidence of said offer is, the said writing, which is made an exhibit, with the affidavit of one Baldwin accompanying the same, showing that he presented a true copy thereof to Gilliss, and left the same with him, and that Gilliss refused to accept the ninety dollars. What other evidence, if any, was before the court to prove the exhibit and offer, is not shown. On the same day, Mathews commenced this suit, claiming of Gilliss, the specific performance of a contract to convey said ten acres of land. In his petition he sets forth Johnson's agency, and his contract with Johnson as above stated; and avers that he released all except the ten acres at Johnson's request; that at that time, he paid Johnson seventy-five dollars; and that he was ready to pay the amount due, and had offered to pay the ninety dollars as aforesaid. Subsequently, there was an amendment filed to this petition, in which plaintiff avers that Johnson, as agent, received money from other persons upon sales of other portions of defendant's lands, and that defendant ratified the same; that when he paid the money to Johnson, he believed he had full authority to receive it; and that he believed that Gilliss

was at that time indebted to Johnson more than that amount, and so charges. Petitioner also proffered, if it should be determined that Johnson had ¿no authority to receive said seventy-five dollars, to pay the same with interest, in addition to the ninety dollars tendered. He also avers that Johnson, under his said authority, sold other lands of defendant, in parcels of ten acres, and that Gilliss ratified the same, and that he ratified this sale by Johnson to plaintiff, subsequent to October 1st, 1851.

The answer denies all the material allegations of the bill, except so far as will hereafter be particularly stated. Mathews having died pending this suit, his wife and devisee, Sarah Mathews, was substituted as plaintiff. Upon this testimony and pleadings, the court below decreed in favor of plaintiff, requiring her to pay, not only the ninety dollars, but also the seventy-five dollars, with interest, that had been received by Johnson. From this decree, the defendant now appeals.

*Claggett & Dixon*, for appellant.

*Samuel F. Miller*, for appellee.

WRIGHT, C. J.—We have above an outline of the present case. Some facts may have been omitted, to which we will revert, however, in the consideration of the legal questions involved. These questions may, for convenience, be considered under these heads: *First.* Had Johnson the power, under the authority given him, to make the contract and sale to Mathews, in the manner and on the terms specified in the agreement of the 1st of May, 1851? *Second.* If he had not, was such agreement subsequently ratified, so as to entitle the plaintiff to a specific performance, and a conveyance of this land? *Third.* If, in either event, the contract was binding, has plaintiff so far shown a compliance with its terms, as to entitle her to the relief sought?

The defendant's counsel, in argument, raise, perhaps, the further question—that the transaction between plaintiff and Barkley was, in truth, a new and another contract; and not

being in writing, was void, as against the statute of frauds. But, as we understand the plaintiff's counsel to claim these acts as a ratification of the contract with Johnson, and not to seek to recover upon it as a new or different contract, it will be unnecessary to consider this point. It has also been suggested, that the tender of the ninety dollars was not proved. This point has not been made by one of the counsel, and barely referred to by the other. The original offer in writing to pay, with the oath, is made an exhibit. What proof, if any, was produced to prove it as an exhibit, is not shown; and without intimating an opinion that this is one of those papers contemplated by section 2428 of the Code, we think it but just to decide the case, upon those points affecting the merits of this controversy, and upon which counsel, in their very full and able arguments, have relied.

Our first duty is, to give a construction to the instrument of March 29, 1851, and to ascertain whether Johnson had the power, under that, to make the contract for the sale of the eighty acres, and these lots, to Mathews. Much has been said as to this instrument; many cogent reasons have been urged in favor of the different constructions claimed; and the instrument is not, perhaps, altogether free from ambiguity. After a careful examination, however, we conclude, that Johnson had not the power to make the sale to Mathews, in the manner provided in said agreement. This view is sustained by two principal reasons, if not more. Giving to language its ordinary signification—taking into consideration the position and residence of the parties—the subject matter upon which the instrument was to operate—and construing the whole together, and not in parts, we conceive that the most that can be claimed is, that the 880 acres of land was to be sold entire, and not less than one block of the lots at a time. However this may be as to the lots, as to the land, the defendant appears to have been particularly definite in making the authority specific. The first says, "for *all* my land, 880 acres, at $10 per acre, $8,800." And then, after giving the number of the lots, and blocks and prices, he says, "the above lands I will sell *all together*, at the above prices." The

use of words, that contemplate the sale of all the lands at one and the same time, would entirely exclude the idea that the lands could be sold in separate parcels; and especially so, when by omitting the words "*all*" and "all together," this intention might have been, to some extent, negatived. Indeed, in an instrument so concise, it would be difficult to use language more definite in this respect, than was employed by the defendant. And this view, receives additional force from other considerations. It is not probable that each acre of these lands was of the same value. It is almost a part of the judicial history of this state, that these shares consisted of lands and lots scattered over this tract, and through the towns and cities thereon situated. But, however this might be, it is but reasonable to say, that each forty, eighty, or one-hundred and sixty acres, would and did differ in value. Under such circumstances, it would be unreasonable, to say the least, to suppose that Gilliss intended that Johnson, should sell indistinct parcels, receiving ten dollars per acre for all alike. And, again, if he intended that each lot might be sold separately, and the lands divided into parcels, why not affix a price to each lot, or each parcel of land, instead of carrying out the sum that he would take for each block and the entire body of land.

Again; by the terms of the power, one-half of the purchase money was to be paid in hand; but by the agreement with Mathews, no money was to be paid down, but the first payment of one-half was to be made on the first of July, 1851. This construction is controverted by plaintiff, on several grounds. It is claimed, that the paper which is first signed by defendant is complete in itself, and shows that *he* would sell the property in that method and for those prices; but that the second is a distinct paper, confers the power, and affixes no terms. Barkley, in his deposition, however, states, in substance, that these papers were both made at once, all the same transaction; and that the list and prices were made out by him for defendant, and given to Johnson. Independent of this, however, we think that both must be taken together. Otherwise, the second part

would be indefinite and void of meaning. This refers to the lands and lots, and says that "Johnson is authorized to sell them at the above prices." What those prices are, we can only determine from the first part. And further, it is not reasonable, that Gilliss would give power to an agent to divide and sell his land in parcels, at the very same moment that he had in effect, declined doing the same thing himself. The rule that plaintiff insists upon, that where doubt arises, the instrument, in its construction, is to be taken most strongly against the principal, has also been considered. It must be remembered on this point, however, that this power was special, given in writing, and none of it rested in parol, or was to be gathered by implication. It was also a naked power, uncoupled with an interest, and revocable at the pleasure of Gilliss. The power conferred was, therefore, to be determined from the instrument itself. The rule insisted upon by plaintiff, was never designed to extend or enlarge the powers conferred, or to change the construction of the written power. It was plaintiff's duty to satisfy himself of the power of the agent in the premises, and if he improperly judged of such power, it would be unconscionable to permit the principal to suffer by such mistake of judgment on his part. We must construe this instrument according to its apparent import, and not allow it to be warped and changed, in order to harmonize with any uncertain or indefinite suppositions. And this it was the duty of the plaintiff to do. These views, we think, are clearly sustained by the case of *Sage* v. *Sherman et al.*, 2 Comstock, 417, referred to by plaintiff. It is there stated, that this doctrine of protecting third persons who have been injured by the excess of the exercise of power by the agent, does not apply, unless the agent is acting in the business intrusted to him, and substantially according to the instructions of his principal. We think we have shown, that Johnson did depart from and exceed the power conferred; and this power being special and limited, subject to the inspection of plaintiff, and not general, he should not, and could not, well have been misled. *Williams* v. *Peyton*, 4 Pet. 395; Story on Cont.

§§ 239 and 284; *Odiorne et al.* v. *Maxey et al.*, 13 Mass. 177; *Delafield* v. *State of Illinois*, 2 Hill, 159; *Hammond* v. *State Bank Mich.*, Walk. Ch. 214.

We now come to the question, whether this contract was subsequently ratified? We think it was. What the agent Barkley did while in Keokuk, in October, 1851, it is true, is not given to us in such systematic detail as would have been expected, in view of the importance of his action on the parties' rights. But, taking all the circumstances in connection, we regard it as sufficiently clear, that he there adverted to this sale, and recognized the power of Johnson to make this contract. The circumstances as we derive them, from all the testimony, are about these: Barkley was, when Johnson was in Kansas, Mo., the friend and agent of defendant, and superintended his business, doing his writing, and perhaps signing his name; for he says in his deposition, in effect, that Gilliss did not sign the authority given to Johnson, but that he did for him, and had such power, and the validity of such signature is nowhere denied by Gilliss. Before he came to Keokuk, he was aware of this sale to Mathews; for he speaks in his deposition, of Johnson's having sent a deed to Gilliss, for his signature, under the contract with Mathews. When he arrived in Keokuk, Mathews was unable to comply with his contract entire. And here let us say, that if Mathews had been able at that time to so comply entire, there can be no question but Barkley would have conveyed to him the property. But Mathews being unable to so comply, by mutual arrangement Barkley proceeds to sell all except this ten acres. And without giving any weight to the release or releases, executed by Mathews on the back of the contract with Johnson, we think their mutual arrangement is sufficiently evident, from the fact that the parties were frequently together, and Barkley, on two occasions, at least, refused to sell this ten acres, though offered an advanced price therefor. Now, he made no new contract with Mathews, for there is no pretence that there was any change of amount or price per acre, time of payment, or anything of that kind. We con-

clude, then, there was such ratification for the following reasons:

*First.* Barkley was the witness of defendant, and he no-where negatives such ratification. This ratification was al-leged in plaintiff's petition and was a question in dispute between the parties—he was the person who knew all about what he did and did not do; and this was within the knowl-edge of defendant. And yet, when it would have been so easy to have negatived such ratification by this agent, if it was true, the defendant entirely fails to ask him any ques-tion tending to elicit such negative.

*Second.* Such alleged ratification is nowhere expressly and specially denied in defendant's answer. There is a general denial of the prayer, statements and allegations contained in plaintiff's amendment to his original petition. And while the averment of ratification is contained in such amendment, and while the answer is specific in its denial of every other material allegation; yet as to this leading and important averment, there is no such denial. If there was no such ratification, it is a little remarkable that defendant failed to so aver, especially, where, in a chancery cause, at least, with-out reference to the provisions of the Code, a specific, and not a general, denial or answer, is required. *Woods* v. *Morrell et al.,* 1 Johns. Ch. 103; *M. E. Church* v. *Jacques et al.,* Ib. 65; Mitford Ch. Pl. 376; Story's Eq. Pl. § 35; Dan-iell's Ch. Pl. & Pr. 833, 835.

*Third.* The acts of Barkley in demanding payment of the purchase money, and recognizing the plaintiff's claim, are inconsistent with any disaffirmance of the contract. He says, that he "did demand of plaintiff seventy-five dollars, it being one-half of the purchase money for the lands de-scribed in the plaintiff's third interrogatory (being this ten acres), about the 19th or 20th of October, 1851, the said amount being then due on said land, upon the sale of the said ten acres from said Gilliss to said Mathews." Now, whatever power Johnson had, was in writing; and while Gilliss might not have been bound by such of his acts as were not warranted by the power, yet he could afterwards

adopt and ratify such acts, and to do so, no particular form of words or instrument was necessary. He might ratify in a great many ways. *Lent and another* v. *Padelford*, 10 Mass. 229; *Odiorne* v. *Maxey et al.*, 13 Ib. 177; *Fisher* v. *Willard* Ib. 399; *Shaw* v. *Nudd*, 8 Pick. 9; *Meritt* v. *Clason*, 12 Johns. 103; *Emerson* v. *Newbery*, 13 Pick. 397; *Amory* v. *Hamilton*, 17 Mass. 103; *Parker* v. *Byrne*, 2 S. & M. 193; *Clark's Ex.* v. *Reimsdyke*, 9 Cranch, 153; *Barbour* v. *Craig*, 6 Litt. 213; *Thorndyke* v. *Godfrey*, 3 Greenlf. 429; Chitty on Cont. 176; *Carnes & Lord* v. *Bleeker*, 12 John. 300; 2 Kent, 615, 616. To the suggestion, that Barkley had no power to ratify that contract, we give no weight, for we consider that the power of attorney under which he acted, gave him as full power in the premises as Gilliss had; and that his assent, or failure to dissent, would be and was as obligatory, as if Gilliss himself had been present.

The only remaining question, is, whether plaintiff shows herself entitled to a specific performance of this contract. That it was competent for these parties to affix their own conditions, as to making time and other matters of the essence of the contract, cannot be controverted. And if they have so done, we shall not hesitate to enforce it, and shall not interfere to make a new contract for them. Unless, however, they have expressly treated time as of the essence of the contract, or unless it necessarily follows from the nature and circumstances thereof, it is not to be so deemed in equity. This general proposition, is so well settled as to scarcely need authority or argument to sustain it. See, however, Story's Eq. Jur. 776, *Hepburn* v. *Ault*, 5 Cranch, 262; *Brashier* v. *Gratz et al.*, 6 Wheat. 528; *Pratt and others* v. *Carroll*, 8 Cranch, 471; Mitford Eq. Jur. 461, 462.

We do not think that time has been made expressly of the essence of this contract, nor have the parties so treated it. Had it been so regarded, Barkley would so have declared while in Keokuk. On the contrary, instead of declaring the contract forfeited, because the first payment was not made at the time specified, he demanded the same, and says he was willing to take it. Had it been so regarded, the defend-

ant would have sold this land, when the offer was made to purchase by other persons, to his agent.   That it was not so regarded, is further shown from the fact, that from October, 1851, to July, 1853, a period of almost two years, he does not declare the contract forfeited, give any notice to that effect, nor do anything to dispose of the property.   And, in addition to these suggestions, is the further fact, that the parties failed to provide in express terms.   This they could have done, and having failed so to do, the plaintiff cannot claim, that which he might have fixed by contract.

Compensation, and not forfeiture, is the doctrine and practice of courts of equity in these cases.   In view of these general propositions, the next inquiry is, whether the plaintiff has been guilty of such negligence in asserting her claim, or delayed in the performance or offer to perform the contract, for such length of time, as that she is not entitled to relief.   All that her husband was to do, was to pay the purchase money.   He avers, and introduces testimony tending to show, that he did pay Johnson seventy-five dollars in October, 1851.   We may as well say here, however, that we give the plaintiff no benefit from that payment.   Johnson, by the terms of his power, had no authority to receive this money.   The plaintiff himself so regarded and treated it, by subsequently consenting to pay the same.   And Barkley, instead of ratifying this part of the transaction, expressly dissented, and demanded that it should be paid to him.   So that this part of the decree, will in no event be disturbed.   On the next day, after the last payment was due, however, plaintiff offered to pay the two last payments, and on the same day, commenced this suit.   If a failure sooner to offer payment, and assert his claim, amounts to gross *laches;* or such time had elapsed as shows negligence, unexplained by equitable circumstances, the plaintiff's bill should be dismissed. It is not necessary that there should have been a strict, legal compliance with the terms, unless the non-compliance goes to the essence of the contract.   We do not regard this failure, as amounting to such *laches.*   And especially so, when it does not appear, that defendant has been prejudiced

by such delay. He has not acted upon the contract as forfeited—made improvements on the land—sold the same, or any part thereof—nor in any way does he appear to have acted in such a manner with reference to it, as that it would be inequitable or unconscionable to enforce the contract. He has sustained no injury, unless it arises from the fact, that the land has increased in value, and the plaintiff thereby has the benefit of a good and fortunate bargain; and the defendant is deprived of the opportunity of selling it for such advanced value. If this was such an injury, however, as the law contemplates, then no contract for the conveyance of land could perhaps be enforced; for no instance would be found where the land had not decreased or increased in value, after the contract was made, and thus the vendor or vendee might claim to be injured. Can there be any pretence, but that Gilliss could have enforced this contract against Mathews? We think not. And though this land had declined in value ever so much, Mathews would have been bound by his agreement. Why, then, are their remedies not mutual, and why should defendant be released from his liability, because of the advanced value of the property, unless there have been laches on plaintiff's part? There has been no other change of circumstances, affecting the character or justice of the contract. All the plaintiff contracted for was compensation, or pay for his land, and not forfeiture, and this he gets by the decree. If plaintiff is not able to perform his part of the contract, then, of course, the decree will be inoperative. And while there has not been that prompt payment of the purchase money, that the strict rules of the common law would demand, yet we do not think there was such delay and laches, as under all the circumstances, should operate to dismiss his bill.

Many of the points made, by the very full arguments of defendant's counsel, have not been noticed in detail. Indeed, to do so, would extend this opinion an unreasonable length. We conceive that our views thereon, are already sufficiently indicated, without further enlargement. But as the proceedings on the part of the complainant, have not been en-

'tirely free from doubt, it is deemed just that she should pay the costs of this cause. The decree will therefore be affirmed as to all things, except the costs, and reversed as to them.

WOODWARD, J.—I concur in the result which the court has come to on the whole case, but desire not to be concluded on one or two points.

I agree that Johnson was not authorized to make the contract, *which he did make*; but am inclined to think, he could receive the first payment on any contract which he *was authorized* to make. If he could not, the plaintiff's cause is probably deficient in the tender.

I hardly consider the proposition, that time is not of the essence of the contract, as a principle or rule of equity. It rather embraces the *exceptions* to the rule, stated in opposite terms.