INGERSOLL v. CORAM et al.

(Circuit Court, D. Massachusetts. December 30, 1903.)

No. 1,757.

1. EQUITY JURISDICTION—SUIT TO ENFORCE PLEDGE OR LIEN.

Equity has jurisdiction of a suit to enforce a pledge of or lien upon the undivided shares of certain heirs at law of a testator in his estate to secure payment to a lawyer for his services in contesting the testator's will.

2. JURISDICTION OF FEDERAL COURTS—SUIT TO CHARGE FUNDS IN HANDS OF ADMINISTRATOR.

A federal court has jurisdiction, equally with a state court of general jurisdiction, of a suit to establish a lien on the interest of defendants in funds belonging to the estate of a decedent and in the hands of an administrator; whatever action it may take, however, being subject to that of the probate court within its proper jurisdiction.

3. EQUITY—BILL—MULTIFARIOUSNESS.

The rule applied that a bill to establish a lien is not multifarious because it also seeks to establish the personal liability of the persons whose indebtedness the lien secures, as an incident to the granting of the equitable relief prayed for.

4. SAME—PARTIES.

Certain heirs at law of a testator assigned an undivided one-third interest in their respective shares of his estate to another heir, who agreed to employ and pay counsel and do all things necessary properly to secure the interests of the assignors in the testator's estate as heirs at law, "it being understood and agreed that this assignment shall be in full for all of such claims and demands, and that no further liability shall exist against the said [assignors] on account thereof." Held, that such assignors were neither necessary nor proper parties to a suit to enforce a lien on their shares in the estate for services rendered by counsel in contesting the will, under a contract with the assignee, made by him pursuant to the power conferred by such assignment, which could not, under its terms, create a charge against them personally or against their unassigned interests in the estate.

5. LIEN—CONTRACT FOR COUNSEL FEES—CONSTRUCTION.

A contract executed by the representatives of the heirs at law of a testator for the services of an attorney and counselor, to be rendered in contesting the will of the deceased, after fixing the fee which was to be paid in case the will was defeated and their clients obtained their shares of the estate, provided that the parties signing were not obligated except to pay said fee out of the funds secured from the estate by certain named heirs, including one of the signers, and others who had assigned to him a certain proportion of their shares in consideration of his carrying on the litigation. Held, that such contract created a lien for the stipulated fee, provided the conditions on which it became payable were fulfilled.

6. CONTRACTS—RULES OF CONSTRUCTION.

Qualifying words are not to be read into a contract where they would narrow the apparent general purpose, and defeat what, but for the addition, would be both a reasonable and just result.

7. SAME—EMPLOYMENT OF ATTORNEY—PERFORMANCE.

A portion of the heirs at law of a decedent employed an attorney and counselor to render services in a contest against the probate of an alleged will of the deceased by a brief and informal contract, by which they agreed to pay him a stipulated fee "in case the will is defeated and our clients get their shares." Held, that such contract, being informal, and between attorney and client, should be interpreted according to matters of substance, and not technically; and that the condition was

substantially fulfilled where a decree was entered by the probate court in accordance with a stipulation between all parties in interest, secured with the aid of the efforts of the attorney and of his advice, fixing the basis of distribution of the property of the decedent in kind, which, with the exception of some inconsequential bequests, was wholly at variance with the provisions of the will, and under which the clients of the obligors in the contract received a larger part of the estate than their shares as heirs at law. Although not in terms set aside, the will was by such decree in substance "defeated," and the heirs named "got their shares," within the fair and reasonable meaning of the contract.

8. RES JUDICATA—PERSONS IN PRIVITY—ANCILLARY ADMINISTRATORS.

The rule applied that an ancillary administrator in one jurisdiction is not in privity with another ancillary administrator of the same estate in another jurisdiction, so that a judgment for or against one can be pleaded as an adjudication to bar an action by or against the other, although the causes of action are identical.

In Equity. On demurrers to bill.

Hollis R. Bailey, Edgar N. Harwood, and John H. Hazelton, for complainant.

Frederick N. Wier, for Coram, Root, and Cummings.

Thaddeus D. Kenneson, for Root.

Horace G. Allen, for Davis, trustee, and Leyson, administrator.

Lewis S. Dabney, for Leyson, administrator.

PUTNAM, Circuit Judge. The pith of this suit, which is in equity, is to the effect that one Andrew J. Davis, who, in his lifetime, was a resident of the city of Butte, in the state of Montana, died in March, 1890, leaving no descendants, but an instrument which was offered for probate as his last will and testament; that this, if allowed, would have disinherited his next of kin except one brother, to whom was given the bulk of his estate; that some of the next of kin resisted the probate thereof, proceeding in the names of Henry A. Root and Sarah Maria Cummings, who were also of the next of kin; that the estate of said Andrew J. Davis was of the value of from $2,000,000 to $5,000,000; that a portion of the next of kin, to wit, Henry A. Root, Sarah Maria Cummings, Elizabeth S. Ladd, Mary Louise Dunbar, and Ellen S. Cornue—said Root directly, and the other next of kin through said Root and one Joseph A. Coram—retained Robert G. Ingersoll, whose administratrix the complainant is, to contest the will, using his professional services as a lawyer; that said Robert G. Ingersoll was to be paid, on certain conditions to be hereinafter named, $100,-000, of which $5,000 has been paid; that the remainder has not been paid, and is owing, with interest; that the next of kin named, either directly or through said Root and said Coram, assigned or pledged the interests which they claimed in the estate of Andrew J. Davis as security for the amount so to be paid to said Robert G. Ingersoll; that also, under the laws of Montana, which state was the locus of the proceedings herein referred to, Robert G. Ingersoll had a lien as a lawyer on said shares; that the condition on which the agreement to pay Robert G. Ingersoll was made had been satisfied, so that the remainder of the $95,000 became due him; that the will was in substance defeated, and the next of kin became entitled to their shares in the es-

tate, so that the assignment, pledge, or lien attached; that a portion of the estate is in the hands and possession of John H. Leyson, as ancillary administrator of the goods and estate of Andrew J. Davis, appointed as such by the probate court in and for the county of Suffolk in the state of Massachusetts, and duly qualified as such; that consequently the said assignment, pledge, or lien attached to the shares of the several next of kin to that portion of the estate which is in the hands of Leyson as such ancillary administrator; and that, therefore, the complainant is entitled to have the assignment, pledge, or lien enforced in equity, and, as incidental thereto, to have the amount which was due to said Robert G. Ingersoll, with interest thereon, ascertained, and judgment therefor rendered against such of the persons named as were and are personally liable. All these details we will repeat more at length, and in the course thereof state precisely the prayers of the bill.

The complainant is a citizen of the state of New York, and all the persons whom we have named, except Ellen S. Cornue, are citizens of other states than New York. Ellen S. Cornue is not made a party to the bill for reasons which we will state later, but it is claimed that she has such an interest as defeats this jurisdiction of this court in view of the fact that she is a citizen of the same state as the complainant.

The parties made respondents to the bill are Joseph A. Coram, Henry A. Root, Charles H. Palmer, Andrew J. Davis, Jr., John H. Leyson, as administrator, Elizabeth S. Ladd and her husband, Charles H. Ladd, Mary Louise Dunbar, and Herbert P. Cummings, as executor of the last will and testament of Sarah Maria Cummings, already named, who is deceased. The relation to this litigation of such of these parties as we have not heretofore named will be explained, but they are not material to the case. The real issue is between the complainant and the five next of kin whom we have described, except Ellen S. Cornue.

In order that the case may be properly understood in some of its aspects, it is necessary to state that, if there had been no will, the estate, under the laws of Montana, would have been distributed in 11 shares, one-eleventh going to the descendants per stirpes of each deceased brother and sister. Consequently, Sarah Maria Cummings, as a sister of Andrew J. Davis, would have been entitled to one-eleventh, or two twenty-seconds; Henry A. Root and Ellen S. Cornue, as children of Anna C. Root, a deceased sister, each to one twenty-second; Elizabeth S. Ladd, a child of Sophronia Firman, a deceased sister, to one-eleventh, or two twenty-seconds; Mary Louise Dunbar, one of the children of Roxanna Dunbar, a deceased sister, to one twenty-second—making a total of seven twenty-seconds, or, as alleged in the bill, three hundred fifty parts out of eleven hundred.

The parties against whom a judgment is prayed for as incidental to the working out of the alleged lien are residents of this district, or have voluntarily appeared; so there is no difficulty on that score. Subpœnas have been duly issued against all persons named as parties respondent in the prayers of the bill who are residents in this district, and duly served with one exception; and all nonresidents have been

brought in by an order issued in accordance with section 738 of the Revised Statutes, as amended or superseded by section 8 of the act of March 3, 1875, c. 137, 18 Stat. 470, 472 [U. S. Comp. St. 1901, p. 513].

The court has been informed that Elizabeth S. Ladd has deceased, and the bill has not been revived in that particular; so there can be no judgment until that defect is cured. There is also a question made by the respondents with reference to the nonjoinder of Ellen S. Cornue, who is a citizen of the same state as the complainant, which question will be disposed of by us in connection with matters of a fundamental character. Also some of the respondents who have been duly served have not demurred, pleaded nor answered, and, indeed, have not even appeared; and the complainant has failed to enter an order of pro confesso as against them, or any of them. Of course, no judgment can be rendered until that failure also is made good. In both of these particulars the court justly complains of the parties that they did not see to it that the record was put in proper form before the case was submitted.

All the parties respondent, except as stated, have demurred. It is not necessary to state the details of the demurrers, because, aside from the questions of jurisdiction which we have already disposed of, all the propositions submitted to us at the hearing may be raised on a general demurrer.

A question seems to be made with reference to jurisdiction in equity over the general subject-matter of the bill; but the enforcement of pledges and other liens securing obligations of any kind have always been favorite sources of jurisdiction in chancery. Indeed, at the common law, there was no suitable remedy for realizing any kind of security, as all the common law allowed was the taking and the retention of possession until the debt was paid. Consequently, with reference to pledges of choses in action, or an interest in an unsettled estate, the common law afforded no practical remedy of any kind. We can go even further, and refer to the fact that at common law an assignment of a chose in action, either by the way of a sale, or of a pledge, or any form of lien thereon, as in the present case, was ineffectual; and with reference to all these the chancery gave a remedy, and protected such assignees and holders of liens of that class. Although the common law now protects them, yet, according to well-settled rules in the federal courts, the remedy in equity has not been defeated, but continues a concurrent one. Moreover, in the present case the interests of the parties have been so incidentally complicated that it would be practically impossible for the common law to deal effectually with the questions before us. Among other things, it will be found that the assignments, pledges, or liens relate only to undivided partial interests in various shares of the estate under consideration; and with reference to undivided interests the common law does not even yet give effectual protection to assignees, pledgees, or lienors.

The respondents also claim, as appears by the bill, that portions of the estate of Mr. Davis which are in this district are under administration by the local court of probate, and therefore in custodia legis to such an extent that this court cannot take jurisdiction to enter any decree in reference thereto. Notwithstanding the proceedings in the

probate court, this court has the same jurisdiction which any court of superior jurisdiction of the state of Massachusetts would have. The state courts of general jurisdiction constantly and properly exercise certain limited powers with reference to interests in estates in the courts of probate, and this to the extent which the present suit in equity requires. The rules and authorities touching this whole topic are sufficiently referred to by the Circuit Court for the District of Maine in Hale v. Coffin (C. C.) 114 Fed. 567, affirmed by the Circuit Court of Appeals in Hale v. Coffin, 120 Fed. 470, 57 C. C. A. 528, and also by the opinion of the Circuit Court of Appeals in Sherman v. The American Congregational Association, 113 Fed. 609, 51 C. C. A. 329. So far as present considerations are concerned, the action of this court would be plainly subordinate to whatever proceedings the local probate court may take within its proper jurisdiction, and the complainant takes her chances in reference thereto. For example, we note that the administration in Massachusetts is strictly ancillary, and we note also that under some circumstances the ancillary administrator may be required by the court having jurisdiction of his accounts to remit any proceeds in his hands to the proper administrative court at the place of domicile of the deceased. Whether, if such an order should be entered, this court could grant to the complainant any effectual remedy, we leave, in connection with all other questions of that character, until the occasion for disposing of them arises, if it ever does. For the present, we are only called on to determine the conflicting rights of divers claimants to sundry shares in the estate of Mr. Davis, leaving the extent of those shares to be determined by another tribunal having jurisdiction thereof, and also leaving for future determination what would be the powers of this court when that tribunal takes action in reference thereto, if it does. In that respect we certainly proceed no further than do the state courts of general jurisdiction when they permit a garnishment by a creditor of the interest which an heir-at law or legatee may have in the estate of a deceased person, nor, as we have already said, any further than the local courts of general jurisdiction are constantly yielding to the demands of litigating proponents.

Something was said at the hearing before us touching the question of laches, but nothing of this nature seems to have been insisted on. Moreover, the bill having been filed within the customary period, namely, six years after the entry of the decree on August 24, 1897, out of which the rights of the complainant's intestate arose, if they ever arose, prima facie laches is not established; and there are not sufficient facts in the record to establish laches on mere equitable principles.

The proposition is also made to us that the bill is multifarious. We are not sure that this relates so much to the demurrer as to the question of interlocutory injunction which is in the case, and which we will have occasion to refer to later; but, in any event, the bill is not multifarious. On the other hand, it is in all respects in exactly the form which the rules of equity practice require—that is to say, a lien cannot ordinarily be established without also establishing the personal liability of the person whose indebtedness the lien secures, if

there is any such personal liability; and, where a bill requires the personal liability to be thus incidentally established, it follows that, according to other fundamental rules in equity which require that the subject-matter of a suit should be completely disposed of in one proceeding, judgment and execution ordinarily go for the amount of the personal liability ascertained.

The bill claims the lien arising in behalf of attorneys under the statutes of Montana in addition to a contract lien. It is possible that, if the complainants could establish a lien under the statutes, the working out of the same would require different parties and a different judgment from what are required in working out contract rights. In that event, the bill might be charged with multifariousness so serious that, the court itself would be compelled to take notice of it. But all we need to say as to this is that, for various reasons not necessary for us to detail, no statutory lien can be maintained, and that that portion of the bill must be regarded as ineffectual; and, as it is specially demurred to, it must be stricken out. Even if this were not done, we are not now prepared to hold definitely that the bill is multifarious for the reason we suggest; but, this being done, it is left free from any such criticism.

We now come to the substantial merits of the case. These turn on the following paper, which unquestionably was delivered to the complainant's intestate by the parties who signed it, all of whom are respondents:

"Butte City, Mont., August 17, 1891.

"R. G. Ingersoll, Esq., Butte City, Montana—Sir: We agree that for your services in the contest of Maria Cummings and Henry A. Root against the probate of the alleged will of A. J. Davis, deceased, rendered and to be rendered, that your fee, in case the will is defeated and our clients get their shares, shall be one hundred (100,000) thousand dollars, and that your expenses and disbursements shall be paid in any event.

"There is to be no personal obligation against J. A. Coram, in the event that the interests represented by Henry A. Root are unsuccessful, and in no event is the said J. A. Coram obligated except to pay such fee out of the funds secured from the estate of A. J. Davis, deceased, by Maria Cummings, Lizzie S. Ladd, M. Louise Dunbar and Mrs. Ellen S. Cornue and Henry A. Root.                                              Henry A. Root.
                                                        "J. A. Coram."

Mr. Ingersoll was, as the bill alleges, both an attorney and counselor at law, and was employed with reference to the subject-matter of the paper which we have quoted in both capacities. The employment was before August 17, 1891, and services had been rendered before that date, so that, as the bill says, the paper in question was "made, signed, and delivered" to Mr. Ingersoll "during the rendition" of his services in the prosecution of the contest against the alleged will. Whatever its history, the respondents undertake to establish therefrom some substantial propositions favorable to themselves. First of all, they say that the writing was a mere offer. This cannot be questioned on the face of the paper. But the bill does not stop there, because it positively alleges that through this paper Root and Coram "promised and agreed to and with the said Robert G. Ingersoll" that he should have and be paid the amount named therein on the terms therein stated. In other words, the bill alleges positively and in terms, which.

of course, are admitted on the demurrer, that a contract was made in accordance with the paper of August 17, 1891.

The respondents also say that, there being a previous contract for services, this of August 17, 1891, constituted a new arrangement, and they inquire what became of the old one; but clearly there is nothing in this question, and none of the suggestions based on it require our consideration. By the very terms of the paper of August 17, 1891, referring, as it does, to "services rendered and to be rendered," the entire relations between the parties were covered into it, and what preceded was absorbed by it.

The first question, therefore, we have to determine with reference to the agreement of August 17, 1891, is who and whose interests it bound. Sarah Maria Cummings, Elizabeth S. Ladd, Mary Louise Dunbar, Ellen S. Cornue, and Henry A. Root entered into a stipulation shown by the bill under date of September 29, 1890, preceding the agreement with Mr. Ingersoll on which this bill is based, by virtue of which all the parties named except Root assigned to Root one undivided third part of all their interest in the estate of Mr. Davis. This provided that whatever services and disbursements Mr. Root had rendered or should thereafter render in the contest against the will in question should be compensated for out of said undivided interests, and that, the parties to the instrument being thus relieved of all personal obligations to Root, the residue of the third interests thus assigned to him, if any, remaining after compensating him as stated, should continue his absolute property. Thus the third undivided interests of the ladies named became from that time the absolute property of Root, and they retained no hold thereon. Therefore it follows that, if Mr. Ingersoll's claim bound only this third undivided interest assigned to Root, and other interests assigned to Coram, as we will explain further on, so far as any lien on assets was concerned, and also if it bound personally, either contingently or otherwise, only Root and Coram, neither Sarah Maria Cummings, Elizabeth S. Ladd, Mary Louise Dunbar, nor Ellen S. Cornue have any concern in this litigation; and the fact that Ellen S. Cornue has not been made a party thereto is immaterial, and the other ladies named should be discharged therefrom. The instrument of September 25, 1890, carefully guarded the remaining two-thirds interests in Mr. Davis' estate retained by each of the ladies who were parties thereto, and carefully protected those interests, and also the ladies themselves, against any personal liability. It is to be noted that the transferees in the instrument were not only Mr. Root, but one Gideon Wells, who subsequently deceased, and who, therefore, did not sign the paper of August 17, 1891, and consequently does not appear in this litigation. It contains the following:

"And the said Root on his part agrees to procure counsel, pay their charges, and do all things necessary properly to secure the interests of the parties above named in said estate as heirs-at-law and next of kin of said Davis."

It also contains the following:

"It being understood and agreed that this assignment shall be in full for all of such claims and demands, and that no further liability shall exist against the said Sarah Maria Cummings, Elizabeth S. Ladd, Ellen Cornue and

M. Louise Dunbar on account thereof. And the said Root shall not be authorized in any way to hold or render either of the above named personally liable or responsible for any of said matters or things."

Nothing in the bill overrules what we find in this instrument. Therefore it is plain that nothing therein, and nothing in the agreement of August 17, 1891, bound personally any of the ladies named, or permitted Root and Coram to pledge their two-thirds interests not thus assigned to Root, or to impose any lien thereon. Therefore it follows that Ellen S. Cornue is not a necessary party to the bill, and the other ladies named, to wit, Sarah Maria Cummings, Elizabeth S. Ladd, and Mary Louise Dunbar, having no interest therein, must be dismissed therefrom. This determination therefore overrules all objections to the bill growing out of any questions of the proper parties thereto.

The subject-matter of what interests are bound by the agreement of August 17, 1891, does not, however, entirely end here. While neither of the ladies referred to, nor any of the interests which belonged to them on August 17, 1891, are involved in this litigation, yet the bill alleges that "during the times herein mentioned" "Coram" "acquired, and still has, owns, and holds, all the remaining interests and shares claimed and finally acquired by said Elizabeth S. Ladd and Mary Louise Dunbar in and to said estate of Andrew J. Davis." This allegation is positive, alike as to time, dates, and title. The expression "during the times herein mentioned" covers, of course, August 17, 1891; and the expression "owns" excludes any remaining interest, contingent or otherwise, in Elizabeth S. Ladd and Mary Louise Dunbar. Therefore, with reference to the remaining two-thirds of the interests which these two ladies assigned to Coram, the agreement of August 17, 1891, imposed a lien on them by its express terms. Yet that fact does not change the conclusions we have stated—that these ladies are not necessary and proper parties to the bill.

Then comes a more obscure allegation, as follows: "Your orator is informed and believes the said Joseph A. Coram also acquired and now has some interest in the shares" "acquired by said Henry A. Root, Ellen S. Cornue, and Sarah Maria Cummings, or some of them." All that can be said about this is that it is altogether too indefinite, both as to dates, interests acquired, and persons, to be regarded as other than inconsequential; so that they can in no way affect the conclusions which we may reach.

The result is that the interests which we have to consider are, first, the entire shares of Elizabeth S. Ladd and Mary Louise Dunbar in the estate of Mr. Davis, and which are now held one-third by Root and two-thirds by Coram; the entire share of Root, who was a party to the paper of August 17, 1891; and the one undivided third of the shares of Mary Louise Dunbar and Ellen S. Cornue, assigned to Root by the instrument of September 25, 1890; and we are also to regard the personal obligations of Coram and Root. As to these, however, it is enough to say, without going into the details, that on the face of the bill a personal obligation exists on the part of each of them; but what they are cannot be ascertained until the bill is heard on answer and proofs, nor is there any occasion for anticipating what conclusions in reference thereto may then be reached.

The next step in the history of the case is that after the trial to a jury, covering several weeks, in which Mr. Ingersoll seems to have been the leading counsel and made the principal argument for the contestants whom we have named, the jury disagreed, and thereafterwards, with the consent and under the advice of Mr. Ingersoll, and with also the consent of Mr. Coram, an adjustment was reached, which resulted in a decree of the court having jurisdiction over the probate of the will, as follows:

"In the District Court of the Second Judicial District of the State of Montana, Within and for the County of Silver Bow.

"In the Matter of the Estate of Andrew J. Davis, Deceased.

"Upon the contest of Henry A. Root, Sarah Maria Cummings against the probate of the will of the said deceased, wherein John A. Davis is proponent and Henry A. Root et al., contestants; and the contest of Harriet Sheffield and Henry A. Davis against the probate of said will, wherein John E. Davis. administrator of the estate of John A. Davis, deceased. has been substituted for said deceased; and also upon the petition of Elizabeth S. Bowdoin, Calvin P. Davis and Elizabeth A. Smith to revoke the probate of said will.

"Be it remembered, that on the 24th day of August, 1897, the petition in the above-entitled proceeding coming on to be heard, and it appearing therefrom that all the parties interested in the estate of the said Andrew J. Davis, deceased, and the estate of the said John A. Davis, deceased, are parties to the compromise agreements therein referred to, and that an order of the court has been heretofore made on the 24th day of August, 1897, confirming the acts of the administrator of the estate of the said John A. Davis, deceased, in making, executing, and delivering the compromise agreements therein referred to, and that all of the said parties so interested in said contest now pending are represented by attorney present in court:

"It is ordered that the contests heretofore instituted in this court by Elizabeth S. Bowdoin, Calvin P. Davis, and Elizabeth A. Smith be, and the same are hereby, dismissed (and the order admitting said will to probate, being no longer opposed, said order is in all respects confirmed), each party to pay his or her own costs.

"And it appearing from said petition that the order and decree of this court heretofore made on the 27th day of March, 1895, should be so modified and changed as to entirely conform to said compromise agreements and the order of this court confirming the making, executing, and delivering the same, it is ordered, adjudged, and decreed it be so modified and changed accordingly and in accordance with the provisions hereinafter stated, and that the administrator of the estate of said Andrew J. Davis, deceased, with the will annexed, keep, retain, and hold in his possession and under his control as such administrator all funds, property, and effects necessary and proper to carry out said compromise agreements, said order, and the provisions thereof.

"It is hereby ordered, adjudged, and decreed, in pursuance of said petition, said compromise agreement, and order confirming them, that the rights of the respective parties in said estate of said Andrew J. Davis, deceased, and so held, retained, and controlled by said administrator, and to be distributed by him, be, and the same are, hereby established and declared to be as follows, to wit, that is to say, subject to the bequests in said will of Andrew J. Davis, deceased, given to Pet Davis, Thomas Jefferson Davis, and Miss Bergett, and the expenses of administration and outstanding debts of said estate. The parties to said compromise agreements are hereby adjudged to have and to be entitled to receive the following portions of said estate of said Andrew J. Davis, deceased, to wit:

"Two hundred eleven-hundredths ($200/1100$) thereof in kind to John E. Davis as administrator of the estate of John A. Davis, deceased; two hundred and fifty eleven-hundredths ($250/1100$) thereof in kind to Henry A. Root, Sarah Maria Cummings, Mary L. Dunbar, Elizabeth S. Ladd, Charles H. Ladd, Ellen S. Cornue, and Joshua G. Cornue; forty-four eleven-hundredths ($44/1100$) thereof in kind to Harriet R. Sheffield and Henry A. Davis; fifty

eleven-hundredths ($^{50}/_{1100}$) thereof in kind to Calvin P. Davis; fifty eleven-hundredths ($^{50}/_{1100}$) thereof in kind to Harriet Wood; twenty-five eleven-hundredths ($^{25}/_{1100}$) thereof in kind to Elizabeth A. Smith; fifty eleven-hundredths ($^{50}/_{1100}$) thereof in kind to Elizabeth S. Bowdoin. And, finally, Andrew J. Davis, Jr., and Charles H. Palmer, trustees, appointed in and by the compromise agreement, dated April 23, 1893, are entitled to have and receive as such trustees and for the purpose of such trust four hundred and thirty-one eleven-hundredths ($^{431}/_{1100}$) of said estate in kind.

"It being further ordered, however, that no portion of the real estate owned by said Andrew J. Davis and situated in the state of Iowa shall comprise any portion of said estate in estimating and ascertaining the amount to which the said Elizabeth S. Bowdoin, Calvin P. Davis, Harriet Wood, and Elizabeth A. Smith shall be entitled to receive under the provisions hereof, nor shall they be chargeable with any part of the bequest given to said Thomas Jefferson Davis in said will, but the same shall be settled as to them as if no bequest had been made. And the said contracts and agreements of compromise of the said parties in interest and to be effected by this cause and proceeding are, by consent in open court, adopted and made the basis of this order and decree according to the terms and provisions of said contracts and agreements.

"Done in open court this 24th day of August, A. D. 1897.

"John Lindsay, Judge."

In all respects, we think, the effect of this decree is clear, and in those as to which we are bound by the decisions of the Montana courts the Supreme Court of that state has come to a clear conclusion favorable to the complainant, as we will explain hereafter. The shares to which the five next of kin named in this bill were originally entitled, and which interests were represented by Mr. Root, and in behalf of which he retained Mr. Ingersoll, amounted altogether, as we have said, to 350 parts out of 1,100 parts. It is said that by the decree which we have quoted they received 515½ parts. Exactly how this came about we need not explain, but apparently it was by bargaining in part with the other heirs or next of kin, and in part by allowances covering the expenditures incurred in behalf of their shares in contesting the will, to which the other next of kin had not contributed. A portion of the 515½ parts were assigned to and held by Andrew J. Davis, Jr., and Charles H. Palmer, as trustees in behalf of the five next of kin whose shares are concerned in this litigation. On that account Andrew J. Davis, Jr., and Mr. Palmer are made parties to the bill, as they should have been, although no decree, whatever it may be, can substantially interest them. The bill does not in detail allege the nature of the trust, which is unfortunate, because on final hearing on bill, answer, and proofs it may transpire that there is something therein which would result in the necessary conclusion that, after all, the parties whose shares are here concerned did not receive their 350 parts in any proper sense of the expression. But, so far as the record now submitted to us is concerned, no question of this kind arises, because it is alleged in the bill that this assignment to the trustees was "for the use and benefit of said five contesting heirs," and it is also further alleged that said five contesting heirs "acquired and got absolute right and title" to 515½ parts. Moreover, the respondents, in their briefs, make no question on this score, but admit that the five next of kin named received "not only their shares, but more." They claim, of course, that the shares were not their shares as next of kin; but, so far as the amount is concerned, no issue is made. The

question as to the nature of the shares which they acquired we will return to later.

The allegations of the bill negative not only any possibility that Mr. Ingersoll did not render such services as were from time to time requested by Root, but also any suggestion that he was not at all times faithful to and diligent in the interests which he represented; and it also states that the adjustment, and the decree resulting therefrom, were secured with the aid of his professional labors. The bill says:

"Said Robert G. Ingersoll not only rendered services and counsel in the prosecution of said contests for and on behalf of said five heirs mentioned in said agreement and promise made to and with him as aforesaid in fulfillment thereof on his part, but he also advised and counseled and aided in consummating and effectuating said arrangements and proceedings by which said decree determining said contests in favor of said five heirs represented by him was obtained, whereby said five heirs were awarded, decreed, and became vested with title to and got five hundred fifteen and a half eleven hundredths (515½-1100) of all and singular the funds and other property, both real and personal, of said estate of Andrew J. Davis, deceased, as aforesaid."

It also alleges more definitely as follows: That the "five contesting heirs" (meaning those whom we have named) "got absolute right and title" to the interests which they finally secured "through the prosecution of said contests and decree," meaning the contests relating to the will by said Robert G. Ingersoll as their attorney and counselor and the decree we have quoted. The bill continues: "Whereby, and by reason of the prosecution of said contest and proceedings, and decree determining the same, said will was defeated in so far as it could affect the rights, shares, or interests in and to said estate of said five heirs mentioned in said agreement" (meaning the agreement of August 17, 1891).

Of course, on the demurrer all these allegations are admitted; and, indeed, it is not questioned that Mr. Ingersoll rendered all such services as a counselor at law and attorney as were desired by Root, representing the interests he did represent, and that the ultimate result, whatever it was, was obtained by, through, and with his assistance as a counselor and attorney. There is no question, therefore, that, so far as rendering services was concerned, and contributing to the result, Mr. Ingersoll was entitled to the conditional fee to the same extent as if he had secured a verdict of a jury against the will, followed by a final decree refusing it probate. The defense does not rest there at all, but it puts itself upon two propositions. One is that within the meaning of the paper of August 17, 1891, the will was not "defeated," and the other that within its meaning the clients of Messrs. Root and Coram "did not get their shares."

It is hardly claimed, if it is claimed at all, that the paper of August 17, 1891, was insufficient to pledge or give a lien on the interests to which it referred, or that the prayers of the bill are not suited to the enforcement of a lien of that character. If such propositions were seriously made, they would be easily disposed of. It is true that the language of the contract is expressed very much like the phraseology of demonstrative legacies. Such phraseology is sufficient to charge specific property with the payment of a legacy, and there is no ques-

tion that, on a conveyance by Root of the interests referred to in the paper of August 17, 1891, to a third person, burdened by such language as we find here with the payment of Mr. Ingersoll's fee, would create a trust therefor. Upon all settled rules with reference to the construction of such instruments, we cannot doubt that this one of August 17, 1891, created a lien on the funds therein referred to in behalf of Mr. Ingersoll.

No doubt, the formal prayer of the bill is in some respects inapt, but at one place the bill distinctly alleges that the complainant has "a valid, lawful, and existing claim and lien upon and interest in" the shares involved in this litigation. In the same connection it alleges that the complainant is entitled to enforce the payment of the alleged indebtedness by subjecting thereto the said "funds and effects" already referred to. The principal relief prayed for is that the personal liability of Messrs. Root and Coram may be ascertained, and that the amount reserved by the agreement of August 17, 1891, "be declared, adjudged, and decreed to be a lien resting upon and adhering to all and singular the shares, parts, and parcels of and interest in said funds and effects of the estate of Andrew J. Davis, deceased, acquired for said Henry A. Root, and one-third part thereof acquired for his four associates, heirs," etc. The bill also contains a prayer for general relief. So there can be no question that the lien exists, provided the terms of the agreement of August 17, 1891, were complied with, and that it is sufficiently alleged in the bill, and that the prayers of the bill are sufficient to require its enforcement.

We come now to the underlying question in the case: Were the terms of the contract of August 17, 1891, complied with? Although evidently this contract was informal, and it concerned the confidential relations between counsel and attorney on one side and client on the other, so that, therefore, only its substance was regarded by either party to it, yet the respondents insist on giving it a very strict, close, and technical construction. First of all, we have already seen that the result, whatever it was, was secured with the aid of the efforts of Mr. Ingersoll, and of his advice, and that no suggestion is made that he failed in his professional duty in any respect. While this particular topic is not, of course, made an express condition of the contract, it is implied. Therefore it needs that we should expressly lay it aside, as we have done.

Coming to the expression, "our clients get their shares," the respondents admit, as we have seen, that the persons referred to received in kind the full proportions of the estate which they would have received if the will had been rejected by the jury and the court, and the estate had been administered as intestate. Therefore on this point their position is strictly contrary to the substance of the agreement, and absolutely narrow and technical. It is enough to say that the language of the agreement does not require so close a construction; and that, the shares of the persons concerned having been substantially received, its terms, on any fair rule of interpretation, have been complied with in that particular. Not only at this point, but at various other points, the respondents, as well as the Supreme Court of Montana in the case interpreting this contract to which we will hereafter

refer, are compelled to insert words which the agreement does not contain for the purpose of making sure that their narrow construction should be sustained. At this particular point the respondents say that the. word "shares" refers to shares to come to the parties concerned "as next of kin and heirs at law." Thus, as we have said, they inject into the agreement what is not there. Such an injection of words not appearing in a contract or a statute may be required when evidently necessary to work out its probable purpose, and to thus avoid unreasonable and unjust conclusions; but it never is required, and cannot be permitted, where the injection of additional phraseology narrows the apparent general purpose, and defeats what, except for the addition, would be both a reasonable and a just result.

Again, in the same line of reasoning, the respondents assert that what the parties concerned got they got not as the property of the deceased, but as the property of John A. Davis, the proponent. Neither is there anything in the contract which calls for the introduction of this qualification. It looks simply to the persons concerned getting their "shares," without any limitation in terms referring to the question whether or not the shares were obtained directly or indirectly. Even if the respondents were entitled to call for a technical construction in this respect, they are fully met by the terms of the decree of the 24th day of August, 1897, and of the decision of the Supreme Court of Montana enforcing and interpreting the same.

Who are next of kin according to the statutes of Montana, and who share directly in the estates of persons domiciled in Montana at their decease are strictly local questions, as to which the decisions of the highest tribunal of the state would ordinarily be conclusive. As to this particular, the phraseology of the decree and the decisions of the highest court of the state of Montana are strictly with the complainant. The decree says: "The parties to said compromise agreements are hereby adjudged to have and to be entitled to receive the following portions of said estate of said Andrew J. Davis, deceased, to wit." Then the decree divides the estate into 1,100 parts, and assigns to various next of kin concerned several of said 1,100 parts, all "in kind." This, on its face, can be interpreted only as giving the next of kin the "property of the deceased," or portions thereof, and not at all distributing it "as the property of John A. Davis." The Supreme Court of Montana, in In Re Davis' Estate, 71 Pac. 757, 27 Mont. 490, on an issue directly made, under such circumstances that none of the rulings to which we will refer can be held as a dictum, held that the court which entered the decree of the 24th of August, 1897, had jurisdiction to enter the same, and that the same was conclusive on the parties in interest. The case was an appeal from an order of the lower court referred to, making a partial distribution of Mr. Davis' estate, on the petition of Henry A. Root and others. An appeal was taken against the order of distribution by the administrator, and by some other parties, because, among other reasons given, Root was neither an "heir, devisee, or legatee" within the meaning of those words as used in the statutes of Montana providing for such appeals; but the court rejected this contention, and the opinion says, among other things, "The petitioners [meaning Root and those associated

with him] are, in effect, distributees." Referring to the decree of the 24th of August, 1897, the opinion further says: "The order itself became the basis of administration, and controlling as to the devolution of the property." But, whatever the language of the opinion, the decision was directly to the point that Root, and those associated with him, came, with reference to their application for distribution, within the terms of the statute, "heir, devisee, or legatee." Therefore, whether regarding the true rule for construing this informal agreement, or conceding that the respondents, with the view of defeating its purposes, were entitled to bring into it the terminology which we say they have sought to bring into it, and conceding that, in any view, they are entitled to a narrow, technical construction of the words "get their shares," their positions are met by the application of the decision of the highest court of the state where the contract was made and intended to be carried out.

This leaves only the question whether or not the will was "defeated" within the meaning of the contract. It is true the will contained certain bequests to Pet Davis, Thomas Jefferson Davis, and Miss Bergett. The will was made in 1866. The bill states that these were "minor bequests of maintenance," and that some of the three persons named had deceased. So far as the record is concerned, there is nothing to cause us to conclude that these bequests were of any actual value in 1897. In the presentation of the case to us no reference has been made to them by either party except incidentally, and no point made on their account. Therefore on this demurrer we must assume that they are inconsequential. Had they been bequests absorbing a large portion of the estate, then, by the terms of the decree, it might well be said that the will had not been defeated in any proper sense of the word. It is sufficient, however, for the present purpose, that it is not denied that the parties named in the agreement of August 17, 1891, received what was the equivalent of their full shares of the estate, and more. Therefore we must conclude that the bequests are of minor consequence, or such a division of the estate could not have been accomplished. At any rate, for the reasons stated, they pass from our consideration. Such being the fact, it is difficult to understand how it can be maintained, as a matter of substance, that the will has not been "defeated," when the decree disposing of the estate ignores and rejects all of its provisions. As we have already said, an informal contract, like this under consideration, is to be interpreted according to matters of substance. Under the decree of 1897 the will became a mere name, and only a husk. Of course, the decree is to be taken as a whole; and, taken as a whole, the will is named in it only to be annulled and disregarded. It is impossible to understand how, under the circumstances, in any true sense of a contract like that under consideration, it can justly be claimed that the will was not defeated.

Here again, however, the respondents insist on injecting words not found in the contract. They say that the statutes establishing the probate practice in Montana provide for the special verdict of a jury, with a judgment to follow it, "either admitting the will to probate or rejecting it"; and they ask whether there can be any doubt that the

contract was made in the light of this statute, and they maintain that what the parties had in mind was a judgment rejecting the will in accordance with the terms of the statute. But nothing in the contract adopts the statute. Nowhere does the contract use the word "rejected." The whole of this is sought to be injected, as we have said, for the purpose of defeating a reasonable construction of the contract, and therefore, for reasons already stated, it is not permissible.

Thus, taking up the case de novo, and independently of the decision and opinion of the Supreme Court of Montana in Harris v. Root, 73 Pac. 1133, 27 Mont. 560, on which the respondents rely with much confidence, it is our view that all the terms of the contract of August 17, 1891, have been fully and substantially met, and upon the demurrers as the case now stands it is with the complainant.

The suit of Harris v. Root was brought by one John S. Harris, who had been appointed ancillary administrator in Montana of the goods and estate of the complainant's intestate. The respondents are correct in maintaining that the essential subject-matter of the suit was the same as that now before us, and that the opinion rendered in behalf of the court was directly against Harris as administrator thereon. The respondents also state with full accuracy the rules of res judicata as enforced in the federal courts. If, as the record stands, the judgment in Harris v. Root had been on the merits, and if, also, the ancillary administrator in Montana had been in the sense of the law in privity, the judgment of the Montana court would have been an estoppel, and would have defeated this bill.

Looking at the record submitted to us with reference to the motion for a temporary injunction in this case, in which appear the entire proceedings in the Montana courts in Harris v. Root, the aspect there presented to us leads strongly to the conclusion that the judgment was based on the merits, and that the dismissal was something more than a mere nonsuit; so that on the face of these papers, notwithstanding the peculiarity of the practice acts of Montana with reference to dismissal of suits, we are strongly impressed with the view that the final judgment therein would operate as a bar towards all in privity. Nevertheless, the bill fails to make a part of itself the record proper containing these proceedings. It sets up this litigation only incidentally in its charging part, with the view of meeting any suggestion of laches, and it alleges in terms a nonsuit. Of course, therefore, this allegation, admitted on demurrer, has nothing in the record to qualify it. Consequently, as the suit stands before us, in no event does the Montana litigation estop the complainant with reference to her present bill. But in no aspect can it operate as an estoppel. The law is settled beyond question that an ancillary administrator in one jurisdiction is not in privity with an ancillary administrator in another jurisdiction; so that no judgment by or against Harris as ancillary administrator in Montana could avail for or against an ancillary administrator appointed by the courts of Massachusetts bringing a suit in that state or in this district, although the cause of action was identically the same. This rule is so thoroughly established that we need not dwell upon it, only to say that it has been fully recognized and enforced by the Supreme Court in Aspden v. Nixon, 4 How. 467,

497, 11 L. Ed. 1059; Stacy v. Thrasher, 6 How. 44, 58, 12 L. Ed. 337, and sequence; Johnson v. Powers, 139 U. S. 156, 159, 11 Sup. Ct. 525, 35 L. Ed. 112; Carpenter v. Strange, 141 U. S. 87, 104, 11 Sup. Ct. 960, 35 L. Ed. 640.

Nevertheless, the result in Harris v. Root and the opinion of the court therein cannot be overlooked. First of all, if the application for a temporary injunction had been an ordinary application for such an injunction, there can be no doubt that the proceedings in Harris v. Root would have barred it. The underlying interests were the same, and on an ordinary motion for temporary injunction we should have said that the complainant had had, in a certain sense, her day in court, and could not be allowed by subsequent litigations, one, two, three, or more, to vex the respondents by such applications. But in this case the order for an injunction was not for the usual purpose of an ad interim injunction. However, by well-settled rules, on the question of construction of this contract, and also on the questions involved relating to a compliance with its terms, neither the opinion nor the decision of the Supreme Court of Montana, inasmuch as the latter does not operate absolutely as an estoppel, can bind this court. Yet they are entitled to very great consideration, and therefore we should yield to the opinion if we could reasonably do so. But it is impossible for us to accept its propositions.

We will state generally that the line of the opinion is in the same direction as that taken by the respondents, in that, instead of availing itself of the just and reasonable rules of construction applicable to informal instruments of this character, it insists on close, technical propositions. It takes no notice, however, of the respondents' claim that the shares obtained by the parties named in the agreement of August 17, 1891, did not come to them as next of kin. Its fundamental defect is in the interpretation it puts on the nature of Mr. Ingersoll's retainer, thus at the very first step making a departure from the path which leads to a true construction of the contract. The opinion says that Mr. Ingersoll "was willing to embody in the contract the provision that neither Root nor Coram should be liable except upon the complete success of the enterprise through a contest." Referring to this particular, and also to other particulars, the opinion proceeds that counsel for the defendants contended that "this is the only construction of which the contract is susceptible"; and it concludes as to this that the court agrees with this contention. No such phraseology, however, can be found in the contract. So far as a contest is concerned, it merely assumes that one is pending, and that the compensation to be made to Mr. Ingersoll is for his services therein; but it does not in terms render it a condition that the complete success—that is, the defeating of the will—must come "through a contest." In other words, if, after the agreement of August 17, 1891, was made, and after the long trial in which Mr. Ingersoll was subsequently engaged when the jury disagreed, as we have already said, the proponents of the will had suddenly abandoned their claim that it should be probated, and thereupon the court had allowed it, Mr. Ingersoll would, by the terms of his contract, have been entitled to his

127 F.—28

stipulated fee. There can be no question on this point; and yet, by thus inserting in the contract what does not there appear, and by which no reasonable or just purpose can be accomplished, the court in Harris v. Root entered on a path which inevitably led it astray. Whatever occurs in the opinion subsequently to this flows out of it, especially the proposition that Mr. Ingersoll's retainer required him to prosecute the contest, and the further proposition that his retainer did not authorize him to compromise' the controversy, and that, when additional authority for that purpose was conferred upon him by his clients, it was in substance a new retainer, operating as a mutual abandonment of the contract. Independently of the fact that, as the bill stands, whatever Mr. Ingersoll may have done in the way of aiding a mere compromise, if there had been in legal effect only a compromise, would not have been a violation of his retainer, but simply performing additional services for which he might have been entitled to additional compensation.

An extract we have already made from the bill puts this correctly in saying that Mr. Ingersoll not only rendered services and counsel in the prosecution of the contest, "but he also advised and counseled and aided in consummating and effectuating the arrangements and proceedings by which said decree determining said contest" "was obtained." Not only is it impossible from these allegations to infer an abandonment of the original retainer, but the retainer itself, as shown by the contract of August 17, 1891, was of too general and liberal a character to be put within the narrow lines laid down for it in Harris v. Root.

Moreover, the line of reasoning in the opinion under consideration travels in a circle. It argues that Mr. Ingersoll was not entitled to compensation unless the result contemplated by the contract was secured by a contest, but in doing this it assumes that what was secured was not the legitimate result of the contest made by him. As we have seen, the court was not justified in making this assumption. We are confident that there is nothing in this opinion which requires that we should depart from the natural methods applicable by settled rules to the solution of questions arising under informal contracts like that at bar.

There is no doubt that the particular form of result by which the will in this case was defeated, and by which the parties concerned derived their shares in Mr. Davis' estate, was not anticipated when the contract of August 17, 1891, was made; yet, as said in Pollock's Principles of Contracts (7th Ed.) 257, "In such cases any rule not inconsistent with justice is better than uncertainty." We think we have complied with that suggestion; and we have also given proper effect to the well-settled rule, repeated in Addison's Law of Contracts (10th Ed.) 42, to the effect that the terms of contracts are to be understood in "their plain and ordinary and popular sense," unless for some reason they have acquired "a peculiar sense distinct from the popular sense." Neither of the vital expressions in this contract—that is, the word "defeated" and the words "their shares"—has any technical meaning in the law, or "any peculiar sense distinct from the popular sense" in any way acquired. Therefore we cannot understand

why the respondents are entitled to replace the word "defeated," so common in ordinary use, by the statutory word "rejected," or add to the words "their shares" the words "as next of kin," or in any way replace either of these crucial expressions by, or add to them, the technical words of the law which the parties to the contract saw fit not to use.

Our conclusion therefore is that on the record now before us the bill should be sustained except as against Sarah Maria Cummings, Elizabeth S. Ladd, and Mary Louise Dunbar, and except so far as it claims a statutory lien. We need not express our views, however, at this stage of the case, as to the method of working out the details of what the bill seeks to obtain.

The conclusion to which we have come may require some modification of the ad interim injunction ordered in this case; and, if either of the parties to the bill desires, application can be duly made therefor, and will be heard by the court.

Inasmuch as it is settled law that, whatever order is now entered, it will only be of an interlocutory character, and that there can be no order actually dismissing any parties from the record until the final decree; and as it may be ultimately held, on hearing on bill, answer, and proofs, or on appeal, that the parties respondents who are now ordered to be discharged should not be, the court reserves all questions of costs to abide the ultimate result.

It is ordered that, after the bill has been perfected as to parties, in the manner in which it should be perfected as set out in the opinion passed down this day, there will be an order for an interlocutory decree holding that the demurrers are good and sufficient so far as they relate to all portions of the bill claiming a statutory lien, and to those portions making Sarah Maria Cummings, Elizabeth S. Ladd, and Mary Louise Dunbar respondents; that so much of the bill as seeks to establish a statutory lien be dismissed; that Sarah Maria Cummings, Elizabeth S. Ladd, and Mary Louise Dunbar shall be dismissed as parties respondent; also adjudging that the said demurrers are insufficient in law as to all other portions of the bill and other parties made respondents therein, and that such other respondents may answer within such time as shall be fixed by the court.