**GREER INV. CO. et al. v. BOOTH et al.**

No. 691.

Circuit Court of Appeals, Tenth Circuit.
Dec. 19, 1932.

Elmer J. Lundy, of Tulsa, Okl., for appellant Petroleum Royalties Co.

A. F. Moss, of Tulsa, Okl. (M. A. Breckinridge and H. R. Young, both of Tulsa, Okl., and Edward G. Fletcher, of Providence, R. I., on the brief), for appellees.

Before COTTERAL, PHILLIPS, and McDERMOTT, Circuit Judges.

PHILLIPS, Circuit Judge.

The Petroleum Royalties Company, hereinafter called the Trust, is a common law trust organized by a declaration of trust dated September 19, 1925, in which the Greer Investment Company, hereinafter called the Investment Company, was grantor, and F. H. Greer, L. L. Greer, and J. A. Ruffer were trustees.

The declaration of trust provided a capital stock of two million dollars, divided into one million preferred shares and one million common shares of the par value of one dollar each.

Paragraphs 4, 6, and 33 of the original declaration of trust in part read as follows:

"Fourth: The Trustees shall have the power and discretion, as if absolute owners, to invest the trust fund for the operation of the business of owning, buying, selling and otherwise acquiring oil and gas royalties, both developed and undeveloped, in the United States of America.

"Sixth: The Trustees are further authorized to purchase such oil royalties, in whole or in part, as they shall deem advisable, using the trust fund provided by the shareholders for that purpose; and said properties shall be purchased in the name of the Trustees, or any one of them, as Trustees, or trustees for The Petroleum Royalties Company, and the Trustees or Trustee shall hold said property, so acquired, subject to the provisions hereof, for the sole use and benefit of the shareholders.

"Thirty-third: This Declaration of Trust may be altered or amended by the Trustees, provided, that such alterations or amendments are in conformity with the laws governing Common Law Trusts. * * *"

The declaration of trust was amended on June 25, 1926, and again on June 29, 1928.

Article 12 of the original trust agreement provided that the Investment Company should pay all expenses of organization, salaries of trustees, office rent, expenses of procuring royalties, traveling expenses, and expense of sale of preferred shares, and should receive 250,000 common shares for each year's service. By the last amendment it was provided that the Investment Company might receive in lieu thereof ten cents for each share of preferred stock sold.

Paragraphs 25, 34, 35, and 36 of the declaration of trust, as last amended, read as follows:

"The term of this trust shall be for a period of twenty (20) years; provided, that the trustees may at their discretion terminate the trust hereby created by dividing the trust funds thereof among the shareholders, being first duly indemnified for any outstanding obligations or liabilities, and shall thereupon be forthwith discharged; and in case of a decision by the trustees to terminate the trust as herein provided, all property interests owned by the trust shall be converted into money and the proceeds of the sale, less actual expenses, if any incurred by said conversion of trust properties into cash shall be distributed, in accordance with their respective interests, to the shareholders—provided, however, that should it seem judicious to the trustees so to do, they may at their discretion, convey the trust fund and other assets to trustees of a new trust or to a corporation, being first duly indemnified for any outstanding obligations or liabilities. In such event the new trustees, should conveyance be made to trustees, or to the corporation, should conveyance be made to a corporation, shall succeed to all the powers conveyed by this trust.

"Thirty-fourth: The terms of the Trustees, unless sooner terminated by their death, removal, incapacity, or resignation, shall be for the full period of the existence of this Trust; provided, it is expressly declared that the Trustees shall not be under obligation to terminate this trust or convey the Trust funds except as herein provided.

"Thirty-fifth: The Petroleum Royalties Company and its Trustees, are hereby prohibited from creating any indebtedness of any kind, either in notes, bonds or mortgages. No royalty shall be bought until the money is in the treasury to pay for it; the determination of this trust being to operate strictly on a cash basis.

"Thirty-sixth: The Petroleum Royalties Company and its Trustees as such, are hereby prohibited from engaging in any business other than the purchase and sale of oil royalties. It shall have none of its funds tied up in oil wells, or in oil lease equipment or

operation, or engage in any other business whatsoever, except the royalty business."

The Petroleum Royalties Company of Oklahoma, hereinafter called the Corporation, is a corporation organized under the laws of Delaware on January 13, 1931. On January 20, 1931, it was authorized to transact business in Oklahoma as a foreign corporation.

The certificate of incorporation of the Corporation authorizes it.

"To buy, acquire, sell, retain, deal in or otherwise dispose of, absolutely or contingently, petroleum and/or gas properties and interests (whether like or different), and any right, title or interest therein, and to do all other acts and things required to be done in connection therewith, either within or without the State of Delaware, United States of America."

And provides that

"The voting power of the corporation is vested in the common stock."

The Investment Company was organized under the laws of Oklahoma in 1913. From the inception of the Trust to May 1, 1931, the officers and directors of the Investment Company were F. H. Greer, L. L. Greer his wife, and J. A. Ruffer his bookkeeper. Its capital stock of the par value of $25,000 during such period was all owned by F. H. Greer except two shares, one of which was owned by L. L. Greer and the other by Ruffer.

One million shares of common stock of the Trust were issued to the Investment Company in payment for services rendered and expenses paid by it. Sixty-five per cent. of such common stock eventually passed to F. H. Greer, and thirty-five per cent. remained with the Investment Company.

In September, 1930, F. H. Greer discussed with J. Edward Jones the purchase by the latter of the common shares of the Trust. Jones told Greer that he did not care to purchase the common shares of the Trust, but would be interested in the purchase of the common stock of a Delaware corporation to which the properties of the Trust had been transferred. Thereupon, Greer caused the Corporation to be organized. The trustees of the Trust transferred to the Corporation all of the assets of the Trust. In consideration of such transfer, the Corporation agreed to deliver 221,529.3 of its preferred stock and 100,000 of its common stock to the Trust or its nominees. The plan contemplated an exchange of stock in the Corporation for shares in the Trust at the ratio of one for ten. In pursuance of this plan the Investment Company and F. H. Greer received 100,000 shares of the common stock in the Corporation in exchange for their shares in the Trust.

On March 24, 1931, Greer and the Consolidated American Royalty Corporation, a Delaware corporation controlled by J. Edward Jones, entered into a contract by which Greer agreed to sell and the Consolidated Corporation agreed to purchase 100,000 shares of common stock of the Corporation for $250,000.

At the time of the transfer of the assets of the Trust to the Corporation, the authorized preferred stock of the Trust had been increased to five million shares. 2,215,293 shares had been sold and were then held by approximately 2,300 shareholders.

On February 2, 1931, F. H. Greer, as president of the Trust, and on March 2 and 10, 1931, F. H. Greer, as president of the Corporation, sent out letters to the preferred shareholders of the Trust urging them to exchange their shares in the Trust for stock in the Corporation at the ratio of ten for one. These letters omitted to explain the essential differences between the Trust and the Corporation with respect to their management and the business in which they could engage. Approximately 97 per cent. of the preferred shareholders exchanged their shares.

This suit was commenced on April 20, 1931, by T. J. Booth, a holder of preferred shares in the Trust, in behalf of the Trust, himself, and other shareholders in the Trust who might join therein. Subsequently thereto 294 persons, who were either holders of preferred shares in the Trust or had been such holders and had exchanged their shares for stock in the Corporation, with the consent of the court joined with Booth as parties plaintiff. The aggregate par value of the shares in the Trust, which the plaintiffs still held or had so exchanged, was approximately $647,655.

The bill prayed that the exchange of stock be rescinded and the preferred certificates in the Trust restored; that the transfer of the assets of the Trust to the Corporation be canceled and set aside; that the trustees be required to account for a large number of alleged trust violations, and that the trustees of the Trust be removed and new trustees appointed.

The trial court found many serious trust violations on the part of the trustees, not material on this appeal. It further found that the trustees were without authority to

transfer the assets of the Trust to the Corporation, and that such transfer was made as a part of a scheme to enable Greer and the Investment Company to sell their common shares of the Trust to J. Edward Jones, and not for the purpose of benefiting and advancing the interests of the Trust.

On October 5, 1931, the court entered its decree in which it removed the original trustees and appointed new trustees of the Trust, appointed a master to take an accounting between the Trust and its former trustees and the Investment Company on account of maladministration of the Trust, and adjudged and decreed that the plaintiffs, who had exchanged their preferred shares in the Trust for preferred stock in the Corporation, be restored to their former status as preferred shareholders in the Trust; that the transfer of the assets of the Trust to the Corporation be set aside, and that the Corporation should assign, transfer, and deliver such assets to the new trustees.

The Corporation has appealed from that decree.

■■ The suit was primarily in behalf of the Trust. There was no prior demand upon, and refusal by the trustees to bring and prosecute such a suit. That such a demand and refusal is a prerequisite to a stockholders' suit is well settled. But an exception to the rule is as well settled as the rule itself. Where the facts and circumstances make it clear that such a demand would be refused, such a demand and refusal is not a prerequisite. Thompson on Corporations, vol. 6 (3d Ed.) § 4596; Delaware & Hudson Co. v. Albany & Susquehanna R. Co., 213 U. S. 435, 29 S. Ct. 540, 53 L. Ed. 862; Ogden v. Gilt Edge Consolidated Mines Co. (C. C. A. 8) 225 F. 723; Whittaker v. Brictson Mfg. Co. (C. C. A. 8) 43 F.(2d) 485; Haynes v. Fraternal Aid Union (D. C. Kan.) 34 F.(2d) 305. The purpose of the suit in the instant case was to remove such trustees and to obtain an accounting for their unfaithfulness, and to set aside illegal transactions entered into by them. It was apparent that such suit would not have been brought by such trustees and that a demand upon them would have been futile. The case is, therefore, within the exception to the general rule.

The Corporation objected to the shareholders in the Trust who had exchanged their shares joining as parties plaintiff and seeking rescission of such exchange on the ground that their joining as plaintiffs and seeking such relief would render the bill multifarious.

■■ It is well settled that a bill is not multifarious which presents a common point of litigation, the decision of which will affect the whole subject-matter and settle the rights of all parties to the suit. Jones v. Missouri-Edison Co. (C. C. A. 8) 144 F. 765; Price v. Union Land Co. (C. C. A. 8) 187 F. 886. A court of equity in a single suit will investigate and determine all questions incidental to the determination of the main controversy. Price v. Union Land Co. (C. C. A. 8) 187 F. 886; Ross v. Miller (C. C. A. 4) 252 F. 697; Bernier v. Griscom-Spencer Co. (C. C. N. Y.) 161 F. 438; Olmsted v. Superior (C. C. Wis.) 155 F. 172; Rogers v. Penobscot Min. Co. (C. C. A. 8) 154 F. 606; Jahn v. Champagne Lumber Co. (C. C. Wis.) 147 F. 631; Ingersoll v. Coram (C. C. Mass.) 127 F. 418; Mills v. Hurd (C. C. Conn.) 32 F. 127.

■ It was essential to their right to maintain the suit in behalf of the Trust that the shareholders who had transferred their preferred shares should be restored to their former status as shareholders in the Trust, and such relief was incidental to the main relief sought. The seeking of such incidental relief in a suit which had a common point of litigation, the decision of which would affect the whole subject-matter and settle the rights of all the parties thereto, would not render the bill multifarious.

■ Furthermore, the doctrine of multifariousness rests largely upon considerations of inconvenience and expense (United States v. American Bell Telephone Co., 128 U. S. 315, 352, 9 S. Ct. 90, 32 L. Ed. 450; Graves v. Ashburn, 215 U. S. 331, 335, 30 S. Ct. 108, 54 L. Ed. 217; Hosmer v. Wyoming Ry. & Iron Co. [C. C. A. 8] 129 F. 883, 888), and it cannot be said that the joinder complained of resulted in any inconvenience or extra expense to the Corporation. Rather, it was to its advantage to have both the preliminary and main questions decided in one suit.

We conclude that the bill was not multifarious.

■ It will be noted that, under the provisions of the declaration of trust, the business of the Trust was restricted to the owning, buying, and selling of oil and gas royalties, and the trustees were expressly prohibited from engaging in any other business. On the other hand, it will be noted that the Corporation was authorized to engage generally in buying, selling, and dealing in petroleum and gas properties and interests. This, of course, included many things not embraced in the term "royalties." It will be further noted

that the management of the Trust is expressly vested in the trustees, and the shareholders had no voice in such management; while under the articles of incorporation the management of the Corporation was vested in the owners of the common stock, the directors elected by the common stockholders, and the officers elected by such directors. We are of the opinion that the trustees did not have the power to change so radically the scope of the business and the method of managing the Trust.

■ Furthermore, we do not think the declaration of trust authorized the transfer of both the legal and equitable titles to the assets of the Trust to a corporation in exchange for stock in the Corporation. Section 25 of the declaration of trust, as last amended, in providing that the trustees might transfer the trust fund to a new trust or to a corporation, expressly provides that the new trustees or corporation, as the case may be, shall succeed to all the powers conveyed by the declaration of trust. We are of the opinion that the intent of this language is that a conveyance to a corporation, other than for cash, must be made to it as trustee, and that the corporation shall exercise the powers of the trustee under the declaration of trust. Moreover, another part of section 25 provides for the termination of the Trust by division of its assets among the shareholders, and, in such event, that all the property owned by the Trust shall be converted into money, and that the cash arising from the conversion of the Trust property, after deducting actual expenses, shall be distributed to the shareholders in proportion to their interests. The transfer and exchange of stock in the instant case terminated the Trust by dividing the trust assets, viz., the stock it acquired in the Corporation, among its shareholders. The action of the trustees did not convert the Trust property into cash, as required by section 25. It arranged for the distribution, not of cash, but of stock in the Corporation. Had the transfer been to a corporation as trustee to act as trustee under the declaration of trust, there would have been no termination of the trust and no violation of such provisions of section 25. In order to comply with section 25, the transfer would have had to be to the Corporation for cash, or to the Corporation as trustee. It seems clear, therefore, that there was no authority to transfer the assets of the Trust to the Corporation in exchange for stock. See Moody v. Flagg (C. C. Mass.) 125 F. 819.

■ Finally, it was the duty of the trustees to manage the assets of the Trust for the benefit and advantage of the shareholders, and not with an eye to their personal advantage and profit. Magruder v. Drury, 235 U. S. 106, 119, 120, 35 S. Ct. 77, 59 L. Ed. 151; Murphy-Bolanz L. & L. Co. v. McKibben (Tex. Com. App.) 236 S. W. 78, 80; Perry on Trusts (6th Ed.) vol. 1, § 427.

We, therefore, conclude that the transfer to the Corporation was void and that the court rightfully set it aside.

■ Certain of the shareholders in the Trust had made no transfer of their shares. They had the right to have this void transfer set aside and the Trust property restored to the Trust. They sued in behalf of the Trust and all parties interested therein. Upon such restoration, the shareholders who had exchanged their shares would be entitled to have their Trust certificates restored. Furthermore, the exchange of the certificates in the Trust for stock in the Corporation was made without full knowledge of the material facts. This, in our judgment, entitled the shareholders who made the exchange to have the same rescinded and their interests in the Trust restored.

The decree is affirmed as to the relief granted against the Petroleum Royalties Company of Oklahoma.