### HOSMER et al. v. WYOMING RY. & IRON CO. et al.

(Circuit Court of Appeals, Eighth Circuit. April 28, 1904.)

#### No. 1,873.

1. APPEAL—GROUNDS FOR REVERSAL—MULTIFARIOUSNESS OF BILL.

An appellate court of the United States will rarely reverse a decree in equity on the sole ground that the bill was multifarious, and it will not do so where the causes of action joined are not repugnant or inconsistent with each other, and where the only loss or inconvenience to a

defendant from such joinder arises from his having been subjected to the payment of costs with which he is not justly chargeable, which can be remedied by a modification of the decree.

2. VENDOR AND PURCHASER—PAYMENT OF PURCHASE MONEY—TIME AS OF THE ESSENCE OF THE CONTRACT.

A court of equity will not hold time to be of the essence of a contract for the absolute sale of mining property, so as to cause the forfeiture of the rights of the vendee thereunder because of his failure to make payment promptly, in the absence of an express stipulation to that effect, and where it appears from recitals in the contract in making statement of the consideration that the greater part of the original purchase price of the property had been paid by the vendee under prior contracts between the parties for which the later one was substituted.

3. SPECIFIC PERFORMANCE—CONTRACT FOR SALE OF REALTY—NECESSITY OF TENDER.

When a contract evidences an actual sale and purchase of real property, and time is not an essential element therein, and the parties have substantially progressed with performance, the rule requiring a tender of payment by the purchaser before institution of suit for specific performance is not of imperative application, and a bill for that purpose will not be dismissed for failure to make such tender, where it appears that complainant has a substantial interest in the property, and a dismissal would work loss and inconvenience to both parties; but where the costs of the suit might have been avoided, had the tender been made, they will be taxed to complainant, although the suit is contested.

Appeal from the Circuit Court of the United States for the District of Wyoming.

This was a suit brought by the Wyoming Railway & Iron Company against Edward S. Hosmer, Addison A. Hosmer, Amanda S. Hosmer, David S. Wegg, and the Colorado Fuel & Iron Company, to enforce specific performance of a contract for the sale of certain mining claims and real property appurtenant thereto in Laramie county, Wyo. The contract sought to be enforced was entered into by defendants Edward S. Hosmer and David S. Wegg on September 7, 1898, and was supplemented and qualified by certain agreements of extension. The Wyoming Company, the complainant, was the successor in interest of Wegg. Amanda S. Hosmer succeeded to the interest of Edward S. Hosmer, her son. Addison A. Hosmer, after filing a disclaimer, departed this life. The Colorado Company was the lessee of the Wyoming Company, and was engaged in mining and removing iron ore from the property in controversy. Wegg filed a cross-bill against the Hosmers, which was substantially in aid of the relief sought by the complainant. The Hosmers, excepting Addison A., claimed in their answers a forfeiture of the contract and of all rights of the purchaser thereunder. The property involved in the suit comprised what was generally known as the "Sunrise Group" of patented mining claims, including in such designation the appurtenant mill sites.

The transactions leading up to the contract last mentioned will be briefly noticed. Some time in 1891 William Sturgis, Jr., who was then the legal owner of part and the equitable owner of the remainder of the "Sunrise Group," contracted to sell the property to one Charles A. Guernsey, representing himself, Wegg, and one Kennan, for the sum of $120,000. Afterwards, in June of that year, Edward S. Hosmer came into the transaction, and agreed to furnish the entire amount necessary to acquire the property from Sturgis, the same to be held for the benefit of himself, Wegg, and the latter's associates, Guernsey and Kennan, each to have a one-fourth interest, subject, however, to the payment to Hosmer of the moneys expended by him in the purchase of the property, with certain additions by way of interest and a bonus in case of resale by them. The title was to be taken in the name of Hosmer as his security for the moneys advanced. The agreement between the four parties, dated June 9, 1891, provided that Wegg and his associates

¶ 3. See Specific Performance, vol. 44, Cent. Dig. § 286.

should have the right to sell the property, and that Hosmer should deed to their vendee upon the payment to him of the moneys advanced and interest, and the bonus in addition thereto. It was also stipulated that, if the property was not sold within a limited period, it should, at Hosmer's option, be conveyed to a corporation to be formed, Hosmer to receive one-fourth of the capital stock, and Wegg and his associates to receive three-fourths thereof, in consideration of the conveyance by them of certain other mining claims and property in the vicinity of the "Sunrise Group." When Hosmer came into the transaction new papers were drawn between him and Sturgis. Sturgis executed a deed conveying to him the "Sunrise Group," and placed it in escrow. Sturgis and Hosmer executed an escrow agreement, so called, which specified the times of maturity of the deferred installments of the $120,000 purchase price. The agreement contained explicit and stringent provisions making time of payment by Hosmer of the essence of the contract, and providing that upon default in the payment of any installment on the due day thereof all previous payments should be forfeited to Sturgis as liquidated damages, and that he might immediately resume possession of the property. About three months later, the property not having been resold by them, several contracts were drawn up and signed by Hosmer and Wegg and his associates, looking to the formation of the corporation and the conveyance to it of the "Sunrise Group" and the other properties. These contracts, however, were subsequently canceled and abandoned. It was contended on the part of Hosmer that the abandonment was caused by certain misrepresentations of Wegg and his associates concerning the title to the properties which on their part they were to convey to the corporation. It was contended by Wegg that the cause was the financial embarrassment of Hosmer, which rendered him unable to complete the payments to Sturgis. Wherein lies the truth among their contentions is immaterial. They are referred to merely as marking a stage in the progress of the transactions between the parties. Whatever the cause, Hosmer concluded to accept repayment of the moneys thus advanced by him and drop out of the enterprise. On March 24, 1892, Hosmer, Wegg, and Guernsey entered into a new contract, Kennan retiring, which recited the contract between Hosmer and Sturgis, that the consideration to be paid Sturgis was $120,000, that at that time Hosmer had paid thereon $42,000 of principal and $912.92 of interest, and that Wegg and his associates had paid thereon $3,000. It was agreed that Wegg and Guernsey were within five years from that time to pay to Hosmer $44,287.92 (the increased amount being due to certain other small disbursements), with interest at 5 per cent. per annum, and were also to assume and pay to Sturgis the remaining $75,000 and interest necessary to secure the Sturgis deeds, which were still held in escrow. Hosmer on his part agreed to use his best endeavors to secure for Wegg and Guernsey an extension from Sturgis of time for paying the remaining installments of purchase price, and he also agreed to execute to them a warranty deed for the property when they had paid to him the amount above mentioned, and had also paid the balance due Sturgis and the taxes upon the property. This is one of the important contracts bearing on the controversy between the parties, and it is one of those recited in the contract of September 7, 1898, the specific performance of which was sought to be enforced. It will be noticed that this new arrangement contemplated no change in the contract with Sturgis, that the right of purchase from him was left in the name of Hosmer, that payments of the balance due Sturgis would therefore be made in the name of Hosmer, and the deeds which were held in escrow would come to the latter upon final payment by Wegg and Guernsey. When this agreement with Hosmer was reached, Wegg and Guernsey contracted with the Wyoming Company, the complainant, a corporation organized and controlled by them, to convey to it the "Sunrise Group" in consideration of a certain amount of its capital stock. Guernsey subsequently surrendered to Wegg his rights under the contract of March 24, 1892, and Wegg completed the payment to Sturgis of the remaining installments of the purchase price, amounting, with interest, to $81,377.80. From time to time prior to September, 1898, he also made payments to Hosmer aggregating $9,857.61, but did not thereby reduce the principal of Hosmer's claim, nor pay all of the interest thereon.

On September 7, 1898, Hosmer and Wegg entered into the contract sought to be specifically enforced by complainant's bill and the cross-bill of Wegg. This contract recites that on June 15, 1891, Hosmer contracted with Sturgis for the purchase of the "Sunrise Group," and made certain payments upon the purchase price; that on March 24, 1892, Hosmer entered into a contract with Wegg and Guernsey whereby the latter agreed to pay to Sturgis the balance of the purchase price, and further agreed to pay to Hosmer on or before March 24, 1897, the sum of $44,287.92, with interest; that Hosmer agreed, in consideration thereof, to convey the property to Wegg and Guernsey; that Sturgis had been paid in full, and that deeds vesting title in Hosmer were in the possession of a certain bank; that Wegg had acquired the interest of Guernsey; that Wegg had not paid to Hosmer any part of the principal sum due him, nor had he paid all of the accrued interest; that there was due to Hosmer an additional $5,000 on account of the purchase for Wegg and his associates of another claim not included in the "Sunrise Group"; that Wegg was desirous of acquiring the "Sunrise Group." Following these preliminary recitals is this expression of the consideration for the contractual clauses of the instrument: "Now, therefore, in consideration of the premises and of one dollar in hand paid by each of the parties hereto to the other party hereto, respectively, the receipt whereof is hereby mutually acknowledged, and in further consideration of the covenants herein contained and for other valuable considerations, it is agreed as follows." By this contract Wegg bound himself to pay to Hosmer $60,000, with interest, in certain installments, the last thereof maturing March 24, 1900, and also to pay all of the taxes upon the property. Hosmer agreed to convey the property to Wegg by full and sufficient warranty deed. It was stipulated that the con-' tracts of September 9, 1891, and March 24, 1892, were canceled, and the parties mutually released from all obligations arising by reason thereof; also that if, on March 24, 1900, Wegg was unable to pay the balance of the principal sum due to Hosmer, then notes were to be given secured by mortgage upon the "Sunrise Group" and other properties. Wegg agreed to have the Sturgis deeds recorded, thus vesting complete title of record in Hosmer. The $60,000 to be paid by Wegg to Hosmer was made up of the principal amount specified in the contract of March 24, 1892, the $5,000 advanced by Hosmer in the purchase of the other mining claim and interest, and other disbursements by Hosmer for traveling and living expenses in connection with the "Sunrise Group." There was no provision in this contract of September 7, 1898, making time of payment by Wegg of the essence of his rights thereunder. On May 23, 1899, Hosmer and Wegg entered into another contract, which contemplated the conveyance of the property to the latter, so that he could use it as security for a series of mortgage bonds aggregating $250,000, of which Hosmer was to take an amount sufficient at 80 cents on the dollar (in the language of the contract) "to satisfy the claim he now has against said Wegg." Hosmer agreed to attempt to float the balance of the bonds, and to accept as his commission, if successful, 20 per cent. of the capital stock of the Wyoming Company. Afterwards, for reasons satisfactory to both parties, this contract was abandoned, and Wegg paid to Hosmer $7,500 as compensation for his services. On March 22, 1900, Hosmer agreed in writing that the contract of September 7, 1898, which would mature two days thereafter, should be extended to September 24, 1900, with provision for the payment of some intermediate installments. A further extension to November 24, 1900, was granted by Hosmer upon condition that by so doing there should be no other change or modification of the rights and obligations of the parties. As this last-mentioned day approached Wegg endeavored to secure a further extension of time for payment and the division of the balance due Hosmer into monthly installments. Hosmer resided in New York; Wegg in Chicago. On October 17, 1900, Hosmer wrote Wegg that he could not decide definitely upon any plan of settlement differing from that of the contract in force until some time in November, when he would be glad to take the matter up. He also wrote: "You may rest assured that I will do everything I can to arrange the matter in some way to your satisfaction, if you find yourself unable to carry out the terms of your agreement." On October 26, 1900, Wegg wrote requesting favorable action upon his proposition

of modification, and Hosmer replied on the 1st of November that he was busily engaged in other matters, and when at liberty would, if Wegg would come to New York, talk the situation over with him and see what could be done. On the 15th of November Hosmer wrote that he had completed his other labors and would see Wegg any time that he came. On the 23d Wegg wired that on account of the illness of his wife he was unable to go East at that time, and making another proposition to pay the amount due to Hosmer in monthly payments. On the 24th of November, 1900, the final day of the last extended period, Hosmer wired Wegg that he could not accept the terms suggested and notified him that he (Hosmer) would stand on his legal rights. On the same day Wegg wired in reply that he was ready to pay Hosmer the amount due him, but that he should stand on his legal rights and insist upon delivery of perfect abstract of title with warranty deed, and that until Hosmer was ready to deliver the same he would hold him responsible for costs and damages. The demand for the delivery of abstract of title with warranty deed was unjustifiable, as Wegg well knew. He had several times agreed to have the original deed to Sturgis and the Sturgis deed to Hosmer recorded, and had defaulted in his promise and duty. On the 24th of November, 1900, Hosmer wrote to Wegg confirming his telegram of the same day, but indicated that his purpose was not to make a modification of their contract relations excepting upon personal conference. When Wegg received this letter, he wired Hosmer on the 27th that he misunderstood the latter's telegram, and on the same day he wrote him renewing his proposition of modification. To this Hosmer replied that, as the money had not been paid on the 24th of November, he had sold the property to a party in New York. The sale referred to was to his mother, who took with notice of whatever rights or equities were possessed by Wegg. The deed to Mrs. Hosmer was executed on the 28th of November, 1900. On the 10th day of the following month Wegg deeded the property to the Wyoming Company. On the 24th of November, 1900, Wegg had perfected arrangements enabling him to secure the money to pay the entire amount due to Hosmer, but, instead of utilizing his ability in that respect, he endeavored to secure from Hosmer another extension and modification of terms. Under the contract of September 7, 1898, and its extensions, Wegg paid Hosmer $15,000. All of the payments made to Sturgis and Hosmer upon the property amounted in the aggregate to $109,835.41. The amount due Hosmer, principal and interest, when the suit was instituted, was $53,205.40. At this time the complainant or Wegg had received in royalties upon ore taken from the "Sunrise Group" the sum of $23,365.59. The bill of complaint was filed December 12, 1900. No tender of the amount due Hosmer was made by either the complainant or Wegg prior to the institution of the suit. The bill, and an amended bill afterwards filed, contained a general offer to pay and deliver to defendants, or to such of them as might be entitled thereto, and upon such terms and at such times as might be found by the court to be just and right, any and all stocks, moneys, and other property found to be due to them. Wegg by his cross-bill made substantially the same offer in connection with a prayer for an accounting.

On November 5, 1898, the Wyoming Company executed a mining lease of the property in controversy to the Colorado Fuel & Iron Company; the latter contracting thereby to pay certain royalties upon the ore removed. It was alleged in the amended bill of complaint of the Wyoming Company that it had the right to cause the application of the royalties accruing under the lease to the payment of any sum that might be found to be due to Hosmer; that the Hosmers were seeking to prevent the payment of royalties, and that the lessee was threatening to discontinue its payments; that the complainant consented, and prayed that the Colorado Company be required to pay into court such royalties as might accrue under the lease, and that the court make such disposition thereof as was just and right. Mrs. Hosmer demurred to the amended bill upon the ground, among others, that it was multifarious, because of the joinder of a suit to enforce the contract of September 7, 1898, with an action against the Colorado Company upon the lease. The demurrer was overruled. Upon motion of complainant the Circuit Court ordered the Colorado Company to pay into court the royalties accruing under the lease.

The company did so. Subsequently it was decreed that the clerk pay the money so deposited to the complainant, and the costs of the suit, including the 2 per centum upon the amount of royalties paid to complainant out of the registry of the court, were taxed to the Hosmers. The final decree awarded specific performance upon payment into court by complainant of the amount found due to Hosmer, from which was to be deducted the costs. The Hosmers appealed.

Brainard Tolles and J. F. Vaile (Wolcott, Vaile & Waterman, on the brief), for appellants.

John W. Lacey, for appellee Wyoming Railway & Iron Company.

Timothy F. Burke, for appellee David S. Wegg.

Before SANBORN, VAN DEVANTER, and HOOK, Circuit Judges.

HOOK, Circuit Judge, after stating the case as above, delivered the opinion of the court.

Did the Circuit Court commit reversible error in overruling the demurrer to the amended bill of complaint, which was alleged to be multifarious? Was time of the essence of the contract sought to be enforced? Was the failure of complainant and its predecessor in interest to tender the amount due under the contract fatal to the maintenance of the suit? These are the questions presented on this appeal.

The doctrine of multifariousness in equity pleading rests largely upon considerations of inconvenience and expense. Its limitations are not sharply defined, and it would be both difficult and unwise to formulate a rule for unvarying application. It often becomes a nice question whether the convenience of a complainant, and his interest that a multiplicity of suits be avoided, which is also of public concern, outweigh the inconvenience of the defendants arising from the joinder of two or more causes of action in a single suit, and whether the relation between the causes of action is sufficiently apparent to present a common point of controversy. United States v. Bell Telephone Co., 128 U. S. 352, 9 Sup. Ct. 90, 32 L. Ed. 450; Brown v. Guarantee Co., 128 U. S. 403, 410, 9 Sup. Ct. 127, 32 L. Ed. 468; Barney v. Latham, 103 U. S. 205, 215, 26 L. Ed. 514; Oliver v. Piatt, 3 How. 333, 411, 11 L. Ed. 622; Gaines v. Chew, 2 How. 619, 641, 11 L. Ed. 402. But it has rarely, if ever, happened that a decree has been reversed in an appellate court of the United States upon the sole ground that the bill was multifarious. An appellate court should hesitate in awarding a reversal, if the evil resulting to an objecting party from a pleading of that character may be properly and effectively cured. In the absence of a union of causes of action or defenses which are repugnant and inconsistent with each other, the substantial evil is generally one of costs accruing in respect of a matter in which an appellant has no concern. In the appeal before us it is contended that the complainant used the suit to enforce the payment of rents into court by an unresisting defendant, that the demand was not of an equitable nature, that the contract reserving the rents was solely between complainant and its lessee, that the appellants were not parties to the instrument and asserted no claim thereunder, that the trial court ordered the moneys so turned into court by the lessee to be paid to complainant and taxed against the appellants all of the

costs including those connected with that feature of the case. Assuming, without determining, that the claim of multifariousness is well founded, it is clear that with the lifting of the burden of the costs all substantial cause for complaint would disappear, and that in the action of the Circuit Court there would be nothing of prejudice to the appellants.

The general rule applied in courts of equity is that time is not ordinarily of the essence of a contract for the sale of real property, and that it will not be so regarded unless it affirmatively appears that the parties so intended it. Such intent may be indicated by express stipulation to that effect, or it may be gathered by clear implication from the character of the contract itself, or from the nature of the property which is the subject of the contract, or the avowed purposes of the parties with reference thereto. Thus a strict and prompt performance of optional contracts by the party to whom the privilege of purchase is given is regarded as essential to the maintenance of his rights thereunder. The same rule has been applied to contracts for the sale of property of a speculative character, or which is subject to sudden or frequent fluctuations in value or condition. The principle underlying this rule is manifest. It is designed to prevent a defaulting party from utilizing his own default in a hazard or speculation to the disadvantage of another. But the mere fact that the property is of the character mentioned does not give rise to a necessary or inevitable inference that time of performance is a vital and essential feature of the contract. Other facts and other circumstances may so condition the relation of the parties as to clearly impel a contrary conclusion. Notwithstanding the character of the property, it may appear from their course of dealing that the contracting parties did not regard time as of the essence. It may also appear that the transaction has progressed to such a stage that the vendee has an equity in the property equal or superior to that of his vendor, and that the latter's title or possession should be regarded in the light of a security for the balance of the purchase price, or that the vendee has such an interest that it would be unconscionable to permit of its forfeiture. When by the omission of affirmative stipulation the question is at large, and is one for the determination of a court of equity, it is to be so determined, if possible, that no unnecessary hardship or loss shall be inflicted upon one party not demanded by the clear rights of the other. It is presumed, in the absence of countervailing reasons, that such interpretation was within their intent and purpose when they assumed the contract relation and before their controversy arose. To reach a just conclusion in a suit for specific performance, a court may avail itself of all of those aids which the rules of law permit in the ascertainment of the intention of the contracting parties, and all of the facts and circumstances which serve to disclose their conduct under the contract, their own interpretation of its terms, and their relations to the property and to each other. While it will not make a new contract for them, nor interpolate stipulations not of their selection, nevertheless it will distinguish between those provisions which pertain to the form and those which are of the substance of their agreement, to the end that the former be not permitted to lead to an inequitable and unjust result. The power so to do belongs to one of the great heads of

equity jurisprudence. No express provision making prompt payment by Wegg of the essence of his rights appears in the contract of September 7, 1898, or in any of the agreements of extension. The fixing in the extension agreements of new times for payment is of no more importance in this connection than the specification of the maturity of the installments in the original contract. Does it arise by implication that such vital importance should be attached to time of payment by Wegg? It is clear that the contract is not of an optional character. On the contrary, Hosmer agreed to convey the property to Wegg, and the latter obligated himself unconditionally to pay the remainder of the purchase price. This operated to pass to Wegg an equitable interest in the property, even if he possessed none before, and his interest increased with his continued payments. The legal title remained in Hosmer as security for the balance due him and as trustee for his vendee. Nor should the consideration be overlooked that Hosmer did not acquire ownership of the property solely through his own means, but that, on the contrary, nearly two-thirds of the consideration moving to Sturgis, the original owner, was paid directly by Wegg himself, and in that wise Hosmer secured his title. It is true that the property in controversy is a group of mining claims containing deposits of iron ore, but it is also true that whatever enhancement in value has occurred is attributable largely, if not wholly, to the efforts and industry of Wegg and the complainant. Certain prior transactions are expressly referred to in the contract of September 7, 1898, as constituting a part of the consideration thereof. We do not reopen that contract for the purpose of inserting new stipulations, but simply avail ourselves of its affirmative recitals of the considerations moving between the parties. Briefly stated, those recitals refer to the contract of sale by Sturgis to Hosmer, the partial payment of the purchase price by the latter, his contract of sale to Wegg and associates in consideration of reimbursement to him and payment of balance due Sturgis, the actual payment in full to Sturgis, and the inclusion as part of the consideration of a sum of money expended by Hosmer in another matter. By these recitals and by the evidence we learn that at the institution of the suit Wegg had paid to Sturgis and Hosmer upon the purchase of the property more than $86,000 over and above the royalties received from the mining operations. When this is placed against the fact that there remained due to Hosmer, principal and interest, but $53,205.40, it becomes apparent, in the light of all of the other circumstances of the case, that a forfeiture of the purchaser's rights would be grossly inequitable and unjust, and that it would be unconscionable to impose such a penalty upon him. While it is true that the prior contracts were canceled and the parties released from all obligations thereunder by the contract of September 7, 1898, what was meant thereby was merely that the last contract should stand as the evidence of their rights and obligations, and not that the former could not be referred to, as they were in fact expressly referred to, as indicating in part the consideration already paid and the equitable relation thereby created.

Neither the complainant nor Wegg made a tender of the balance of the purchase price due to Hosmer before the suit was instituted, nor is it at all clear that the offers set forth in the pleadings are sufficient

either in time or character. The amount due to Hosmer was fixed and certain, and did not depend for its ascertainment upon trial and decree by the court. No accounting was necessary. The indefinite and uncertain tenders in complainant's bill and Wegg's answer were well calculated to postpone the performance of an immediate and positive obligation. In this connection it should be said that upon a careful consideration of the record we are of the opinion, notwithstanding the averments of forfeiture in the answers of the Hosmers, that, had a full and fair tender been made to them before suit was instituted, it would have been accepted, and thereby all of the costs incident to this litigation would have been avoided. The course of complainant and of Wegg, its grantor, has caused them to be unfairly charged with the payment of a large bill of costs. Ordinarily, when a tender is not made before the institution of the suit, or is not made in the bill in cases in which it is proper to so tender performance, the bill will be dismissed at complainant's cost. But should that be done in this case? The transactions of the contracting parties were such that at the time the suit was instituted each of them possessed a substantial interest in the property in controversy. The purchaser had paid the major part of the purchase money. He had been, and his grantee was then, in the actual possession of the property, and had caused to be made extensive improvements in the immediate vicinity, to the end that the product thereof was readily marketable. The seller retained the legal title, and there remained unpaid to him, even with interest added, considerably less than one-half of the principal of the original purchase price. When a court of equity has acquired jurisdiction of a suit, it will generally proceed to a complete determination of the entire controversy, and will not remit the parties to additional suits or actions for relief, if such course may be properly avoided. And while, in working out an equitable result, a court has no power to impose conditions not authorized by the settled principles of equity jurisprudence, nevertheless it is well recognized that, under the doctrine that he who seeks equity must do equity, it may so condition and qualify its decree that a righteous adjustment of the claims of the contending parties may be accomplished. The Hosmers have not sought, by act or pleading, a rescission or termination of the contract, except by way of strict forfeiture of Wegg's equitable interests; and this, we have seen, is inadmissible. There should be no forfeiture of his or his grantee's interests, if they are still willing to promptly pay the balance which is due.

No result beneficial to any of the contending parties would be secured by a dismissal of complainant's bill because of failure to tender performance. Their rights would be by such course left in a condition wholly unsatisfactory. When the contract evidences an actual sale and purchase of real property, and time is not an essential element therein, and the parties have substantially progressed with performance, the rule requiring tender before institution of suit for specific performance is not of imperative application. Much depends upon the equities of the particular case, and whether the omission to proffer performance has resulted in a hardship or loss that cannot be readily remedied by the decree. It is not infrequent that the question is resolved into one concerning the mere assessment or apportionment of costs. In Hepburn

v. Auld, 5 Cranch, 262, 3 L. Ed. 96, it was held that a vendor could compel specific performance of a contract for the sale of land, if able to give a good title at the time of the decree, although it was perfected after suit was instituted. And in Hepburn v. Dunlop, 1 Wheat. 179, 4 L. Ed. 65, it was suggested that in a case peculiarly circumstanced a court might even continue the cause for the purpose of affording a party time for the completion of his title. In Stevenson v. Polk, 71 Iowa, 288, 32 N. W. 346, it was said:

"It is sufficient if the title is perfected or incumbrances removed prior to the trial. If the court can then by a decree protect the rights of all parties, this is all either can justly ask, unless there has been a rescission, or an offer to rescind, and the party so offering has done all he is required to do, and was entitled thereto at the time the offer was made." Wilson's Ex'rs v. Tappan, 6 Ohio, 174; Linn v. McLean, 80 Ala. 368; Chrisman v. Partee, 38 Ark. 60; Tewksbury v. Howard, 138 Ind. 111, 37 N. E. 358; Oakey v. Cook, 41 N. J. Eq. 364, 7 Atl. 503.

The principle of these authorities may well be applied to the case of a proffer or tender by a vendee, where considerations of equity and justice demand it. On the whole we are of the opinion that substantial justice will be accomplished by the reversal of the decrees of the Circuit Court and the entry in lieu thereof of a decree in conformity with the views herein expressed.

The decree below will be reversed, with costs, and the case will be remanded to the Circuit Court, with instructions to enter a decree to the effect that Edward S. Hosmer and Amanda S. Hosmer recover of the complainant below their costs in the Circuit Court, to be duly taxed, and that if, within 30 days after the filing in the Circuit Court of the mandate herein, the complainant, as the grantee of Wegg, shall pay into the Circuit Court, for the benefit of the said Edward S. Hosmer and Amanda S. Hosmer, the entire amount due and unpaid under the contract of sale, with interest to the date of payment, all of the costs of this suit in the Circuit Court and in the Circuit Court of Appeals, and the commission or percentage upon said amounts which the clerk of that court will be entitled to obtain for his services in receiving and disbursing the money, the complainant may have specific performance of the contract, and the Hosmers may receive the moneys thus deposited for their benefit; but, if it fails to make these payments at the time and in the manner above specified, it shall be deemed to have elected to abandon all rights under the said contract, and Amanda S. Hosmer shall be deemed and decreed to be the owner of the property free from the claims of the complainant and of the defendant Wegg. Amanda S. Hosmer should not be required to execute a deed containing covenants of warranty against demands, liens, or titles of persons who do not claim under or through her or her grantor, Edward S. Hosmer, nor against claims, liens, or titles arising out of unpaid taxes, general or special.

It is so ordered.